**GOLD CROSS AMBULANCE, et al., Plaintiffs,**

**v.**

**CITY OF KANSAS CITY, et al., Defendants.**

**No. 80–1131–CV–W–7.**

United States District Court, W. D. Missouri, W. D.

May 7, 1982.

C. Robert Buckley, Independence, Mo., for plaintiffs.

George E. Leonard, Shughart, Thomson & Kilroy, Kansas City, Mo., for defendants MAST, 4th Party, Inc., and Jack Stout.

Steven E. Wermcrantz, Linde, Thomsom, Fairchild, Langworthy, Kohn & Van Dyke, Kansas City, Mo., for defendants Hadley Reimal, Lawrence Hughes, June and Eugene DeSaulniers.

Wm. D. Geary, Asst. City Atty., Kansas City, Mo., for defendant City of Kansas City.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS, WHICH ARE BEING TREATED AS MOTIONS FOR SUMMARY JUDGMENT

JOHN R. GIBSON, Circuit Judge, sitting by designation.

Plaintiffs Gold Cross Ambulance (Gold Cross) and Transfer & Standby Services, Inc. (Transfer), two privately-run ambulance companies operating out of Independence, Missouri, bring this five-count complaint against multiple defendants. Count I alleges a violation of Section 1 of the Sherman Act. Plaintiffs contend that defendants Lawrence Hughes, Hadley Reimal, June DeSaulniers and Eugene DeSaulniers consolidated their previously separate ambulance companies into a single corporation, Ambulance Services, Inc.,[1] (ASI), for the purpose of restraining trade. Plaintiffs further allege that these defendants, along with defendant Jack Stout and Stout's company, Fourth Party, Inc., conspired with officials of defendant City of Kansas City and Metropolitan Ambulance Services Trust (MAST), a trust established by the City to oversee the provision of ambulance services, to restrain trade by creating an ambulance service system in which only one ambulance company is allowed to operate in the City.

Count II alleges that defendants have violated Section 2 of the Sherman Act by taking action to monopolize the ambulance service industry in Kansas City. Plaintiffs further allege that defendant MAST has encouraged other municipalities to enact the same type of ambulance service system which Kansas City operates.

Count III alleges violations of the Missouri antitrust statutes, Mo.Rev.Stat. § 416.031 et seq., which outlaw conspiracies in restraint of trade and conduct taken in an attempt to further a monopoly.

Count IV is a 42 U.S.C. § 1983 claim in which plaintiffs allege that they have been deprived of their substantive due process, procedural due process, and equal protection rights. Plaintiffs also allege that defendants have deprived the citizens of Kansas City of their right to choose which ambulance companies they wish to have serve them.

Count V, which is brought directly under the Fourteenth Amendment to the United States Constitution, alleges that defendants have deprived plaintiffs of their due process rights. Plaintiffs also reiterate their claim that defendants are violating the right of Kansas Citians to choose their ambulance company.

Plaintiffs originally filed their case in Missouri state court, alleging only Missouri antitrust law violations and § 1983 claims. Defendant MAST removed to federal court and filed a counterclaim alleging that plaintiffs had violated the federal antitrust laws. MAST then moved for a preliminary injunction against plaintiffs; this motion was denied by Judge Scott O. Wright after a three-day hearing during which numerous witnesses testified regarding the nature of the ambulance service industry and the history of Kansas City's enactment of a one-

1. Formerly called Ambulance Service of Clay County, Inc.

company system. Plaintiffs later amended their complaint to include Sherman Act claims, and all defendants subsequently moved to dismiss the amended complaint. These motions to dismiss are now before the Court.[2]

## I. *Statement of Facts*

Ambulance service in Kansas City has had a varied history. Some years ago the City operated a municipal ambulance service. In more recent times, however, several separate, privately-run ambulance companies operated in the area. Among these companies were plaintiffs Gold Cross and Transfer, as well as the separate companies run by defendants Hughes, Reimal and the DeSaulniers.

In the late 1970's Kansas City officials became concerned about the quality of Kansas City's ambulance service. They were particularly concerned about the private ambulance companies' slow response to emergency calls. The City formed a Public Safety Improvement Committee to look into the problem, and the Committee reported its findings to the City Council on March 20, 1979. On March 30, 1979 the City Council adopted a resolution expressing its intent to improve ambulance service within the City and committing itself to provide emergency ambulance service by a single operating entity. The City also hired a consultant, Jack Stout, to study the feasibility of implementing a single-company system in Kansas City. Mr. Stout has developed what is called the "public utility model" for ambulance service in which numerous, competing ambulance companies are replaced by a single-company system. The public utility model is intended to deal with the major problems inherent in the free-market system.

Emergency ambulance service requires expensive advanced life support equipment. Ambulance companies have little or no control over emergency service costs, and they have difficulty collecting their fees for emergency work. Non-emergency calls are far more profitable since the service is less expensive to provide and the company is more likely to be paid for its work.[3] Ambulance companies operating in an unregulated market thus tend to concentrate on answering non-emergency calls rather than on providing quick, high quality emergency care.

The public utility model seeks to remedy this problem by employing a single ambulance service company and making the company's profitability to its owners contingent on the quality of the service it provides rather than on its ability to collect its bills. Under the public utility model the ambulance company contracts with the City to provide a certain level of medical care and to meet certain response time standards. The ambulance company has a strong incentive to answer each service call quickly and efficiently since the City pays the company in accordance with its ability to meet the contractual standards. If the ambulance company fulfills the crucial contract requirements, it will receive its contracted-for payment regardless of whether the City has been able to collect for the services rendered by the company. If the fees collected by the City do not cover the amount owed to the ambulance company, the City makes up the difference by way of a government subsidy. Under the public utility model the City also owns all the ambulance service equipment, thus minimizing the danger that service will be interrupted by any financial problems which the ambulance service company may experience.

---

2. Pursuant to Rule 12(b)(6), Fed.R.Civ.P., these motions are being treated as motions for summary judgment rather than as motions to dismiss since matters outside the pleadings have been presented to the Court. In ruling on these motions the Court has considered the pleadings, briefs and exhibits filed in this case, along with the transcript of a preliminary injunction hearing held before Judge Scott O. Wright on March 13, 16 and 17, 1981. The Court has also considered the provisions of the applicable state laws and Kansas City ordinances.

3. These and other issues concerning ambulance service were developed in detail in the March, 1981, hearing on MAST's request for a preliminary injunction against Gold Cross and Transfer. These issues are discussed in Judge Scott O. Wright's April 7, 1981, order denying the preliminary injunction.

For the public utility model to be economically feasible it is necessary that the municipally licensed company be the only ambulance service allowed to do business in the City. If other, privately-run companies are allowed to operate freely, they will "skim the cream" by taking virtually all the high profit, nonemergency calls and leaving the emergency business to the municipal system.

In November, 1979, the Kansas City Council enacted an ambulance service ordinance incorporating the major aspects of the public utility model.[4] The first ambulance service contract was given to ASI, the corporation which had been formed by the merger of the ambulance companies run by defendants Hughes, Reimal and the DeSaulniers. The ordinance as enacted requires that there be a competitive bidding process to determine which company will be awarded the city license. However, no competitive bidding procedure was held before the first license was granted because, according to the statements of defendant Kansas City, ASI was the only state-licensed company in the area which could possibly provide ambulance services on the scale necessary to make the single-provider concept work.

Kansas City concedes that, by granting the sole city license to ASI, it has closed other companies out of a major part of the Kansas City ambulance service market. Companies such as Gold Cross and Transfer can bring patients to Kansas City hospitals if they pick them up outside Kansas City city limits. They can also travel through Kansas City on their way to other areas. However, they cannot pick up patients within the city limits. Clearly, this greatly limits plaintiffs' ability to do business in the Kansas City area. Plaintiffs state that they have had to turn down several large non-emergency service contracts because of Kansas City's refusal to grant them a license.

This case presents a number of close and complex issues. We deal first with the federal antitrust claims brought against defendants Kansas City and MAST. The most important issues involve the State Action Exemption to the antitrust laws and the Tenth Amendment.

## II. *State Action Exemption*

Kansas City argues that the restraints it has placed on the ambulance service industry are permissible under the state action exemption to the antitrust laws.

The state action exemption allows governmental bodies to engage in anticompetitive activities which would amount to antitrust violations if engaged in by private parties. Over the years this exemption has come to apply to cases where the state itself has directed or authorized anticompetitive practices in a "clearly articulated and affirmatively expressed" manner, and where the state actively supervises the enforcement of the anticompetitive regulations.

In analyzing Kansas City's ambulance service system to determine whether it meets the state action exemption, it is necessary to examine carefully the development of the exemption. An understanding of both the factual background and the legal reasoning of the major state action exemption cases is therefore extremely important.

### A. · *Origin and Development of the State Action Exemption*

The state action exemption was first recognized in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In *Parker*, the Supreme Court held that a California law designed to decrease competition among raisin growers and to provide price supports for raisins was not a violation of the Sherman Act because the antitrust laws were not meant to cover the actions of a

---

4. For the first two years that the ordinance was in effect, ASI continued to own its ambulance equipment. In September, 1981, this ambulance equipment was sold to MAST, as contemplated by the public utility model. When Kansas City's current ambulance service contract

with ASI expires, a new contract will be given to the company which successfully bids for it, and this company will simply provide the personnel and services necessary to operate the MAST-owned equipment.

state itself. The Court stated, "The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state." 317 U.S. at 350, 63 S.Ct. at 313, 87 L.Ed. at 326. The Court went on to state, "The state in adopting and enforcing the prorate program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." *Id.*, 317 U.S. at 352, 63 S.Ct. at 314, 87 L.Ed.2d at 327.

The state action exemption of *Parker* remained substantially unchanged until the 1970's, when the court ruled on a series of cases invoking the exemption. The first of these was *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). The plaintiffs in *Goldfarb* challenged a Virginia bar association minimum fee schedule, claiming that it was an illegal price-fixing scheme. The Court found that neither the Virginia Supreme Court nor any other arm of the state attempted to enforce the minimum fee schedule; the Virginia Supreme Court's ethical code simply mentioned advisory fee schedules without requiring them. In holding that the minimum fee policy was a violation of antitrust laws, the Supreme Court stated, "It is not enough that . . . anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." 421 U.S. at 790, 95 S.Ct. at 2015, 44 L.Ed.2d at 587.

The Supreme Court again refused to apply the state action exemption in *Cantor v. Detroit Edison Company*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), which involved defendant Detroit Edison Company's policy of distributing free light bulbs to its customers. Plaintiff charged that Detroit Edison was using its monopoly power as a supplier of electricity to reduce competition in the sale of light bulbs. Detroit Edison had begun its light bulb distribution program in the early days of its operation and the program was already in effect at the time of the creation of the Michigan Public Service Commission, the agency which regulated Detroit Edison. The Public Service Commission never specifically approved or disapproved of Detroit Edison's light bulb policy. However, Detroit Edison was not free to change its program without filing a new tariff with the Commission and making an adjustment in its rates. Detroit Edison argued that the Commission's tacit approval of the plan and its requirement that Detroit Edison file a tariff before eliminating it constituted "state action" sufficient to exempt Detroit Edison from the antitrust laws. The Court ruled that a state cannot confer immunity from antitrust laws merely by approving a private company's proposed trade restraint policy and then ordering the company to comply with the policy. The Court stated, "[S]uch a rule may give a host of state regulatory agencies broad power to grant exemptions from an important federal law for reasons wholly unrelated either to federal policy or even to any necessary significant state interest." 428 U.S. at 602, 96 S.Ct. at 3123, 49 L.Ed.2d at 1157.

A year later in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the Court held that an Arizona Supreme Court disciplinary rule which prohibited lawyer advertising did not violate the antitrust laws. The Arizona disciplinary rule on advertising was an affirmative command of the State Supreme Court; it was not merely an acquiescence to the policies of a state or local association as had been the case in *Goldfarb*. In addition, the party enforcing the rule was the Arizona Supreme Court itself rather than the state bar association. The bar association acted merely "as the agent of the court under its continuous supervision." 433 U.S. at 360, 97 S.Ct. at 2697, 53 L.Ed.2d at 822. The need to protect the public from unfair or misleading legal advertising was an important state interest; this was different from the situation in *Cantor*, where the light bulb distribution program did not arise from any perceived need to protect the public interest. The Supreme Court

summed up its holding on the antitrust issues in *Bates* by stating, "[W]e deem it significant that the state policy is so clearly and affirmatively expressed and that the State's supervision is so active." *Id.*

### B. *The State Action Exemption as Applied to Municipalities*

Two recent state action exemption cases have involved anticompetitive actions taken by municipalities. In *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the petitioner cities operated electric companies, providing electricity both within and without their city limits. They engaged in a business activity and realized a profit. In defense of a Sherman Act counterclaim brought by the electric utility with which they competed, the cities claimed that their actions were exempt from the antitrust laws under the *Parker* doctrine. The Supreme Court noted, however, that there is a "presumption against implied exclusions from coverage under the antitrust laws," 435 U.S. at 398, 98 S.Ct. at 1129, 55 L.Ed.2d at 373, and stated that the cities' claims to an exemption could not succeed unless the cities could "demonstrate that there are countervailing policies which are sufficiently weighty to overcome the presumption" against an exemption. *Id.* at 400, 98 S.Ct. at 1130, 55 L.Ed.2d at 375. After considering defendants' arguments at length, the Court concluded that cities are not necessarily exempt from the antitrust laws merely because of their status as governmental bodies. The Court recognized, however, that the actions of municipalities may reflect state policy, and concluded that "the *Parker* doctrine exempts ... anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* at 413, 98 S.Ct. at 1137, 55 L.Ed.2d at 383. In explaining the intent of its holding, the Court stated:

> This does not mean, however, that a political subdivision necessarily must be able to point to a specific, detailed legislative authorization before it properly may assert a *Parker* defense to an antitrust suit.... [A]n adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found "from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of."

*Id.* at 415, 98 S.Ct. at 1138, 55 L.Ed.2d at 384. The Court went on to explain that its decision "does not threaten the legitimate exercise of governmental power, nor does it preclude municipal government from providing services on a monopoly basis." *Id.* at 415, 98 S.Ct. at 1138, 55 L.Ed.2d at 385. In conclusion the Court stated,

> [A]ssuming that the municipality is authorized to provide a service on a monopoly basis, [the limitations expressed in the *Lafayette* case] will not hobble the execution of legitimate governmental programs.

*Id.* at 418, 98 S.Ct. at 1139, 55 L.Ed.2d at 385.

In the more recent case of *Community Communications Company, Inc. v. City of Boulder*, —— U.S. ——, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), the Supreme Court held that the state action exemption did not apply in cases where a state simply granted broad "home rule" power to a municipality. Respondent City of Boulder was a home rule city which had the right of self-government in municipal matters. Petitioner, a cable television company operating in Boulder, challenged a Boulder ordinance which prohibited petitioner from expanding its business for a three-month period, contending that the ordinance constituted a restraint of trade under the Sherman Act.

In an opinion written by Justice Brennan, the Supreme Court found that the requirement of "clear articulation and affirmative expression" is not satisfied when the state's position is "one of mere *neutrality* respecting the municipal actions challenged as anticompetitive." —— U.S. at ——, 102 S.Ct. at 842, 70 L.Ed.2d at 821. (Emphasis in original.) The Court stated, "A State

that allows its municipalities to do as they please can hardly be said to have 'contemplated' the specific anticompetitive actions for which municipal liability is sought." *Id.* The Court noted, "'Under these circumstances there is no interaction of state and local regulation. We have only the action or exercise of authority by the City.'" *Id.*

The Court concluded that each home rule city was free to choose a different method of regulating cable television since no one system was contemplated by the state. The state could not be found to have clearly articulated and affirmatively expressed a policy to regulate cable television in the way Boulder had chosen, and Boulder's regulations were therefore not exempt from the antitrust laws under the *Parker* doctrine.

### C. *Application of the State Action Exemption to this Case*

With the above-discussed state action exemption cases in mind, we look to the particular facts presented in this case to determine whether Kansas City has met the requirements of the exemption.

Missouri's authorization of municipally-run ambulance systems is set forth in Section 67.300, Mo.Rev.Stat., which provides:

1. Any county, city, town or village may provide a general ambulance service for the purpose of transporting sick or injured persons to a hospital, clinic, sanitorium or other place for treatment of the illness or injury, and for that purpose may

(1) Acquire by gift or purchase one or more motor vehicles suitable for such purpose and may supply and equip the same with such materials and facilities as are necessary for emergency treatment, and may operate, maintain, repair and replace such vehicles, supplies and equipment;

(2) Contract with one or more individuals, municipalities, counties, associations or other organizations for the operation, maintenance and repair of such vehicles and for the furnishing of emergency treatment;

(3) Employ any combination of the methods authorized in subdivisions (1) and (2) of this section.

2. The municipality or county shall formulate rules and regulations for the use of the equipment and may fix a schedule of fees or charges to be paid by persons requesting the use of the facilities and provide for the collection thereof.

\* \* \* \* \* \*

Other regulations regarding the provision of ambulance service are contained in Chapter 190 of the Revised Statutes of Missouri. Section 190.105.1 requires all ambulance operators to be licensed by the State of Missouri, and Section 190.125 requires an annual showing of need for each state ambulance license issued. Sections 190.115 and 190.120 set out the equipment and the kind of insurance coverage which each licensed ambulance must have. Section 190.145 lists the qualifications which ambulance service personnel must meet, and section 190.175 details the records which each ambulance license holder is required to maintain.

The State of Missouri clearly contemplated that municipalities may wish to impose their own restrictions on ambulance service, in addition to those imposed by the State. Section 190.105.4 provides that issuance of a state license shall not be construed to authorize operation of an ambulance "without a franchise in any county, municipality or political subdivision which has enacted an ordinance making it unlawful to do so." Section 190.105.5 provides that municipalities are not precluded from adopting ambulance service ordinances which are not in conflict with state law.

Pursuant to the above statutes, the Kansas City Council chose to enact a public utility model ambulance service ordinance. The Council's March 30, 1979 resolution set forth the Council's intent to pass this ordinance and contained the following language:

BE IT RESOLVED BY THE CITY OF KANSAS CITY:

That emergency ambulance service can be best provided to the City by a single

operating entity, contracted with by the Health Department.

The ordinance which the Kansas City Council passed subsequent to its resolution (Ordinance No. 53539, adopted in November, 1979),[5] regulates ambulance service in detail. The ordinance establishes an Emergency Physicians Advisory Board which appoints an ambulance service Medical Director and makes recommendations for the improvement of ambulance service. In addition, the ordinance gives the City's Director of Health authority to promulgate the rules, regulations and standards necessary to implement the public utility system. Pursuant to this authority, the Director of Health establishes standards for clinical performance, patient care, response time and medical protocols, and sets forth procedures for medical control over the delivery of advanced life support by ambulance personnel. The ordinance also requires all ambulance drivers, attendants, and dispatchers to obtain permits from the Director of Health.

■ In analyzing the validity of Kansas City's ambulance service ordinance, we are fully aware that the development of the state action exemption has involved many close decisions from the Supreme Court, including a plurality decision in *Lafayette* and a 5–3 decision in *Community Communications.* The state action exemption still involves many unanswered questions, and the cases interpreting the exemption are not entirely consistent. However, having carefully reviewed the state action exemption cases decided thus far, we are convinced that under the facts presented in this case Kansas City may properly invoke the state action exemption to the antitrust laws.

Missouri has not merely acquiesced in essentially private anticompetitive activity, as was the case in *Goldfarb* and *Cantor.* Rather, the State of Missouri has chosen to enact a comprehensive system for licensing and regulating ambulance companies. Since the regulation of ambulance service is

a legitimate exercise of government authority in an area where there is an obvious need to protect the public safety and health, the case at bar is further distinguishable from *Cantor*, where the Court concluded that the defendant's actions were not motivated by any recognizable state interest.

Unlike the municipalities in *Lafayette*, Kansas City is not seeking to increase its revenues at the expense of private enterprise. In passing its ambulance ordinance, the City was motivated by a wish to improve ambulance service. The City wanted to insure that quick and efficient emergency service would be available to all its citizens, and it was willing to subsidize the service if necessary. There has been no showing that with such a policy the City will derive economic benefit from establishment of a single provider ambulance system.

This case is also distinguishable from the latest state action exemption case, *Community Communications.* Missouri has many statutes dealing with the provision of ambulance service. This is totally unlike the grant of blanket "home rule" power at issue in *Community Communications.* In sections 67.300 and 190.100–190.195 Missouri has announced a state policy to regulate the ambulance industry. These statutes clearly articulate and affirmatively express the state's policy to place anticompetitive restraints on ambulance service. Section 190.125 in particular, which requires a showing of necessity for each ambulance license granted, clearly indicates an intent to regulate the provision of ambulance service on the basis of public need rather than to allow unbridled competition. As the Missouri Supreme Court has found, the thrust of Chapter 190 is "toward control of destructive competition and improvement of [ambulance] service." *City of Raytown v. Danforth*, 560 S.W.2d 846, 849 (Mo. en banc 1978). When the several statutes adopted by Missouri are examined, it is apparent that there has been, in the words of *Lafayette*, "an adequate state mandate for anticompetitive activities." Missouri

5. Amended December, 1981.

has given authority for a "governmental entity to operate in a particular area and the legislature contemplated the kind of action complained of" by plaintiffs.

To satisfy the *Lafayette* requirement such specific detailed legislative authorization is not required, but its existence points clearly to the "authorization or direction" contemplated in *Lafayette*. Sections 67.300 and 190.100–195 contain the clear articulation and affirmative expression of the state policy that cities may operate ambulance services in their respective localities.

The principles of *Lafayette* are in no way weakened by the *Community Communications* case, which recognizes that the state action exemption applies where there is "municipal action in furtherance or implementation of clearly articulated and affirmatively expressed state policy." 102 S.Ct. at 841, 70 L.Ed.2d at 819. In *Community Communications* the Court simply found that there was city action in the absence of any expression of state policy; there was no interaction of state and local regulation. Here, the State of Missouri has spoken clearly on the subject of regulation of ambulance service, and it recognizes the role the city is to play in providing the service by granting franchises, contracting with ambulance service providers and issuing regulations. There is no question about interaction of state and local regulation in the ambulance field, as demonstrated by the statutes of the State of Missouri and ordinances of the City of Kansas City. The reasoning and analysis contained in *Community Communications* and *Lafayette* support the conclusions we have reached.

We recognize that by providing in section 67.300 that cities "may" contract with one or more ambulance service providers the state is allowing a municipality to choose for itself whether or not it wishes to enter into such a contract. This language, however, meets the requirement in *Lafayette* that the state may direct or *authorize* the municipalities to enter into anticompetitive methods of providing ambulance service. The action by the City in response to this authorization is the interaction between state and city recognized in *Community Communications*.

■ The state action exemption also requires that the state actively supervise the enforcement of the anticompetitive regulation. *California Liquor Dealers v. Mid-Cal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).

Adequate state supervision is present in this case. The State of Missouri licenses both vehicles and personnel. Sections 190.-115, 190.125 and 190.135 authorize a full investigation each time an ambulance license application is made. In addition, section 190.125 authorizes the state licensing officer to periodically inspect each ambulance when he deems it necessary. Section 190.140 regulates in detail the services which mobile emergency medical technicians may render. Under section 190.165, the licensing officer can revoke or suspend the license of any ambulance service provider who does not comply with the Chapter 190 regulations. Section 190.171 provides for an administrative hearing when such action is taken. Section 190.185 empowers the Missouri State Board of Health to adopt, amend, promulgate and enforce necessary rules, regulations and standards with respect to ambulance service and ambulance personnel.

Section 67.300, Mo.Rev.Stat., also requires municipalities to formulate rules and regulations for the use of ambulance equipment. This affirmative requirement of the State of Missouri raises a question as to whether the regulation by the City itself satisfies the active supervision requirement as expressed in *Mid-Cal* and the other decisions. The plurality opinion of Justice Brennan in *Community Communications* did not reach the question of whether an ordinance "must or could satisfy the 'active state supervision'" test focused upon in *Mid-Cal*. —— U.S. at ——, n.14, 102 S.Ct. at 841, n.14, 70 L.Ed.2d at 819, n.14. Under the limited circumstances of this case, however, we are satisfied that the action of Kansas City in enforcing its ordinance through its Director of Health, Physicians Advisory Board, and Medical Advisor constitutes active state su-

pervision since its regulation of ambulance service is exercised under the authorization and direction of state policy.

There is strong reason to so consider Kansas City's action. It performs this supervision for the purpose of insuring high quality ambulance service and short response time to the scene of emergency. This is governmental action motivated by concern for public health and safety and is active supervision in interaction with state authorization.

■ We thus conclude that the actions of Kansas City were authorized by clearly articulated and affirmatively expressed state policy and that there is active state supervision, both by the state itself and by the City, of the anticompetitive regulation. This satisfies the requirements of the state action exemption. For these reasons, summary judgment must be granted for defendants Kansas City and MAST on plaintiffs' Sherma Act claims.[6]

### III. *Tenth Amendment*

Although we have determined that Kansas City's actions are exempted by the *Parker* doctrine, we consider it important to discuss briefly Kansas City's second major argument in favor of the validity of its ambulance service ordinance. Kansas City contends that the federal antitrust laws, as applied to it, impermissibly intrude on its regulation of its own affairs, thereby violating the Tenth Amendment to the United States Constitution.

The state action exemption and the Tenth Amendment overlap to a certain extent. A defendant who seeks to invoke the state action exemption must meet a heavy burden. Once "clear articulation and affirmative expression" and "active state supervision" have been shown, the defendant has established that its actions are essentially the actions of the state itself. A finding that the defendant has met the require-

ments of the state action exemption should at least alert the Court that there are also Tenth Amendment rights involved.

■ The ambulance service regulations at issue here were enacted to protect the health of the citizens of the State of Missouri and the City of Kansas City. As such, these regulations fall within the broad concept of "police power." *Kleid v. Board of Education of Fulton*, 406 F.Supp. 902 (W.D. Ky.1976). The exercise of the police power for the general public welfare is a right reserved to the states and their subdivisions by the Tenth Amendment. *Brown v. Brannon*, 399 F.Supp. 133, 147 (M.D.N.C.1975), *aff'd per curiam*, 535 F.2d 1249 (4th Cir. 1976).

This is largely an uncharted area of the law. However, two recent Supreme Court cases are helpful in analyzing defendants' Tenth Amendment argument. In *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court held unconstitutional amendments to the Fair Labor Standards Act which made the Act applicable to the wage and hour policies of state and local governments. The Court stated, "[I]nsofar as the challenged amendments operate to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by Article I, § 8, cl. 3." 426 U.S. at 851, 96 S.Ct. at 2474, 49 L.Ed.2d at 257–58.

The broad language of *Usery* was narrowed substantially in *Hodel v. Virginia Surface Mining and Reclamation Association, Inc.*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). The facts of Hodel are very different from the case at bar. *Hodel* dealt with provisions of the Surface Mining Act. However, *Hodel* is important because it laid down three requirements which must be met before a violation of the Tenth Amendment is shown:

---

**6.** In addition to challenging the validity of the Kansas City ordinance, plaintiffs also claim that defendant MAST has violated the antitrust laws by attempting to induce other municipalities to enact a public utility model for ambu-

lance service. This claim does not merit lengthy discussion. Any such actions which MAST may have taken are clearly exempt from the antitrust laws under the Noerr doctrine, discussed *infra* at page 969.

First, there must be a showing that the challenged statute regulates the "States as States." (Cite omitted) Second, the federal regulation must address matters that are indisputably "attributes of state sovereignty." (Cite omitted) And third, it must be apparent that the States' compliance with federal law would directly impair their ability "to structure integral operations in areas of traditional functions."

*Id.* at 287, 101 S.Ct. at 2366, 69 L.Ed.2d at 23. The Court did not elaborate on these requirements, and gave little indication of what was needed to meet them. The Court did state, however, that a statute would not violate the Tenth Amendment if it regulated only " 'individuals and businesses necessarily subject to the dual sovereignty of the government of the Nation and the State in which they reside.' " *Id.* at 293, 101 S.Ct. at 2369, 69 L.Ed.2d at 26.

Neither *Usery* nor *Hodel* was an antitrust case. However, the concept of Tenth Amendment restraint on federal regulation can have applicability when the antitrust laws infringe on the police power of a state.[7]

Although this is a close case, we believe that the requirements of *Hodel* are satisfied in this case.

In this instance the antitrust laws would prohibit the State of Missouri and the City of Kansas City from enacting ambulance service regulations which they feel are necessary to protect their citizens, and which they would otherwise have the right to enact under their general police power. In this sense the Court believes that the antitrust laws are attempting to regulate "states as states" and the "municipalities as municipalities."[8] The antitrust laws here do not merely affect "individuals and businesses necessarily subject to the dual sovereignty of the government of the Nation and the State in which they reside." Rather, they affect the State of Missouri and the City of Kansas City themselves. The regulation of ambulance service is a particular concern of state and local government, and the operation of ambulance service is an exercise of a city's governmental function. *Bailey v. City of St. Louis,* 578 S.W.2d 278 (Mo.App.1978).[9] Thus, antitrust prohibitions which interfere with state and local government regulation of ambulance service address matters that are indisputably attributes of state sovereignty. Compliance with the federal antitrust laws in this case would directly impair the ability of the State of Missouri and the City of Kansas

7. Recently the Fifth Circuit, in *Jefferson County Pharmaceutical Ass'n v. Abbott Laboratories,* 656 F.2d 92 (5th Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 1629, 71 L.Ed.2d 865 (1982), and the Sixth Circuit in *Hybud Equipment Corp. v. City of Akron, Ohio,* 654 F.2d 1187 (1981), *cert. granted, vacated and remanded,* —— U.S. ——, 102 S.Ct. 1416, 71 L.Ed.2d 640 (1982), held that antitrust regulations could violate the Tenth Amendment when applied to state and local governments. Both *Jefferson City Pharmaceutical* and *Hybud* were decided within a few weeks of *Hodel. Hybud* did not cite *Hodel,* while *Jefferson County Pharmaceutical* cited it only in a footnote to the dissenting opinion. Both cases read *Usery* very broadly, without the qualifying language of *Hodel,* and *Hybud,* which involved state action exemption issues, has been vacated and remanded for reconsideration in light of *Community Communications.* These two cases therefore have limited value as precedent. However, they are significant because of their recognition that antitrust laws, like other federal regulations, can infringe on the sovereignty of state and local governments.

8. As the Supreme Court noted in *Usery* at footnote 20, the Tenth Amendment protects city and local governments as well as the states themselves. 426 U.S. at 856, 96 S.Ct. at 2476, 49 L.Ed.2d at 260.

9. The issue of what constitutes a state governmental function was discussed in the very recent case of *United Transportation Union v. Long Island Railroad Co.,* —— U.S. ——, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982). In this case the Supreme Court found that "operation of a passenger railroad is not among those [state] governmental functions generally immune from federal regulation" under the Tenth Amendment. —— U.S. at ——, 102 S.Ct. at 1354. The case at bar is distinguishable from *United Transportation Union. United Transportation Union* dealt with railroads, which have been the subject of extensive federal regulation for nearly a century. There is no comparable history of federal regulation of ambulance service, which has traditionally been an area of state and local concern.

City to structure integral operations in their traditional government function of providing for the health and safety of their citizens.[10]

## IV. Sherman Act Claims Against Remaining Defendants

In Counts I and II of their complaint, plaintiffs allege that defendants Hadley Reimal, Lawrence Hughes, and June and Eugene DeSaulniers illegally merged their companies into one corporation, ASI, in order to foreclose competition in the ambulance service industry in Kansas City. Plaintiffs also contend that defendants Reimal, Hughes, and the DeSaulniers conspired with defendant Jack Stout and his consulting company, Fourth Party, Inc., to persuade the City of Kansas City to institute a public utility model for ambulance service, thus leading to the monopolization of ambulance service in the Kansas City area.

■ It is clear that if plaintiffs' allegations were confined to defendants' attempts to induce Kansas City to institute a public utility model for ambulance service, they would fail to state a claim under the Sherman Act. Such actions do not violate the Sherman Act because they amount to nothing more than the exercise of defendants' First Amendment rights to attempt to change government policy. First Amendment activities are exempt from the federal antitrust laws under the doctrine announced in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). The fact that some of the defendants may have been acting to further their own economic interests at the expense of their competitors is immaterial for purposes of the *Noerr* exemption as long as they were legitimately attempting to change governmental policy. *Mark Aero, Inc. v. Trans World Airlines, Inc.,* 580 F.2d 288 (8th Cir. 1978).

■ However, plaintiffs allege that defendants Reimal, Hughes and the DeSaulniers did more than merely attempt to influence the actions of the City Council. Plaintiffs state that these defendants illegally combined their companies into one in order to foreclose competition in the ambulance service industry in Kansas City. Such action goes beyond the exemption set out in *Noerr.* For that reason, this Court declines to grant summary judgment as to defendants Reimal, Hughes, the DeSaulniers and their former company, ASI, on plaintiffs' Sherman Act claims.[11]

■ As to defendants Jack Stout and Fourth Party, Inc., however, summary judgment is appropriate. Mr. Stout and his company were hired by the City to study the possibility of enacting a public utility model for ambulance services, and later were employed by MAST as negotiators in dealing with ASI. There is no allegation that Mr. Stout or Fourth Party did anything other than what the City and MAST authorized them to do. Jack Stout and Fourth Party thus share the state action and Tenth Amendment exemption of the City and MAST. *Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561 (10th Cir. 1962), *cert. dismissed,* 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962); *Champaign-Urbana News Agency, Inc. v. J. L. Cummins News*

---

10. Even if the City's actions were not permitted by the state action exemption and the Tenth Amendment, it is not clear that plaintiffs could recover the relief they seek. Plaintiffs ask for both injunctive and monetary relief. Neither *Lafayette* nor *Community Communications,* the two cases dealing with antitrust actions against cities, reached the issue of whether damages could be recovered from a municipality for its violation of the antitrust laws.

In this case plaintiffs are engaged in the ambulance business for private gain. The City, on the other hand, is seeking to protect its citizens' health and safety. The City not only makes no profit from its ambulance service system, it in fact expends tax money to subsidize the system. Under the circumstances, we do not believe the City should be held liable in damages to plaintiffs.

11. As we noted above, defendants Hughes, Reimal and the DeSaulniers sold all the stock of ASI to MAST in September, 1981. There is, however, no dispute that defendants created ASI and owned it until the time of the sale to MAST.

*Company, Inc.*, 479 F.Supp. 281 (C.D.Ill. 1979), *aff'd* 632 F.2d 680 (7th Cir. 1980). For that reason, summary judgment must be granted for defendants Jack Stout and Fourth Party, Inc., on plaintiffs' Sherman Act claims.

## V. *Missouri Antitrust Law Claims*

As both plaintiff and defendants concede, the Missouri antitrust statutes, Mo. Rev.Stat. §§ 416.031 *et seq.*, are to be interpreted in accordance with federal antitrust laws. Since the actions of defendants City of Kansas City, MAST, Jack Stout and Fourth Party, Inc. are exempt under the federal antitrust laws, they are also exempt under the state antitrust laws. *Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Company*, 586 S.W.2d 310 (Mo. en banc 1979).

## VI. *42 U.S.C. § 1983 and Fourteenth Amendment Claims*

In Count IV of their complaint, which is brought under 42 U.S.C. § 1983, plaintiffs allege numerous violations of their substantive due process, procedural due process and equal protection rights. In Count V, which is brought directly under the Fourteenth Amendment to the United States Constitution, plaintiffs allege violations of their due process rights. We will discuss the substantive due process, procedural due process and equal protection issues separately.

### A. *Substantive Due Process*

Plaintiffs' substantive due process claims are vague and imprecise. Essentially, however, plaintiffs are claiming that their due process rights have been violated because the City is preventing them from contracting with potential customers and otherwise operating their ambulance company. They also contend that the City is depriving the citizens of Kansas City of their right to choose the ambulance company which they wish to have serve them.

Plaintiffs argue that they have been deprived of their constitutional right to run an ambulance service company. There is, however, simply no substantive due process right to engage in a particular business. Kansas City is free to regulate ambulance companies in the public interest even if the regulations have the effect of preventing plaintiffs from conducting their business in the city. *Brenner v. State Board of Motor Vehicle Manufacturers, Dealers and Salesmen*, 413 F.Supp. 639 (E.D.Pa.1976).

The ordinance which plaintiffs challenge is essentially a measure passed by the City to protect the public health, safety and welfare. The ordinance does not infringe on any fundamental right, such as the right to privacy or the right to vote, and as such need not be strictly scrutinized by this Court.

Economic regulations such as are involved in this case need not be perfectly drawn in order to be constitutional. As long as the challenged law is passed in proper exercise of the government's police power, the only requirement is that its provisions bear some rational relationship to the purpose that the law seeks to achieve. *Kelley v. Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). As the Supreme Court stated in the case of *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563, 572 (1955), "The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought."

The Kansas City ordinance challenged by plaintiffs meets the "rational relationship" standard. Kansas City's stated purpose in passing this ordinance was to protect public health and safety by improving Kansas City's ambulance service. Kansas City officials were concerned that competition in the ambulance service industry was harming the public. Setting up the monopoly public utility model, in which the receipt of payment for ambulance service is not based on a company's ability to compete for business, is a reasonable means of im-

proving service. Kansas City's ordinance is not arbitrary or capricious; it is reasonably related to the purpose it seeks to achieve.

■ Plaintiffs further complain that the citizens of Kansas City have been denied their right to choose the ambulance service they wish to have serve them. Again, it is not clear that any such constitutional "right" in fact exists. Even if it does, however, plaintiffs are not the proper parties to raise it. Plaintiffs have no standing to assert the rights of the citizens of Kansas City.

■ The general rule is that a litigant "may not claim standing . . . to vindicate the constitutional rights of some third party." *Barrows v. Jackson*, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586, 1594 (1953). The narrow exception to this rule was set forth in the case of *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). In *Singleton* several physicians challenged a Missouri statute which denied Medicaid benefits for abortions which were not medically required. The physicians sought to litigate not only their own right to perform abortions, but also the right of their patients to receive medical advice and treatment. In ruling that the physicians could assert the rights of their patients, the Court emphasized two factors: the relationship between the litigants and the third parties, and the ability of the third parties to assert their own rights.

This case differs significantly from *Singleton*. The interest of the citizens of Kansas City in choosing their own ambulance company does bear some relationship to plaintiffs' interest in providing ambulance service, and it may be difficult for Kansas Citians to protect their interest effectively in court. However, there is no close, confidential relationship between plaintiffs and the citizens of Kansas City as there was between the physicians and their patients in *Singleton*. In addition, while the interests of the plaintiffs in *Singleton* were virtually identical to the interests of the third parties whose rights they sought to litigate, such is not the case here. Plaintiffs in this case are primarily interested in being allowed to operate their company at a profit and without regulatory interference. Kansas Citians, on the other hand, have an interest in the quality of the ambulance service that is provided. Kansas Citians' interest in high quality ambulance services is at odds with plaintiffs' narrow interest in making a profit. Thus, plaintiffs would not be effective proponents of the rights of Kansas Citians.

### B. *Procedural Due Process*

Plaintiffs allege that their procedural due process rights were violated because Kansas City issued the sole City ambulance service license to ASI and renewed that license without following the requirements of its own ordinances, and because the license renewal was granted to ASI without giving plaintiffs notice and an opportunity to be heard.

■ Plaintiffs must show a cognizable Fourteenth Amendment property or liberty right which would be protected by the procedural due process measures which plaintiffs state should have been given. As already noted in the discussion of the substantive due process issue, plaintiffs had no due process right to operate an ambulance service company. They also have no liberty or property interest in the license which was granted by the City. The mere fact that plaintiffs would like to have a license, or that such a license would have great monetary value to them, is not enough. As the Supreme Court has stated, "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 561 (1972). Plaintiffs can point to nothing which indicates that they had such an entitlement. Plaintiffs do not claim that officials of the City of Kansas City promised them a license or even promised them an opportunity to compete for a license. Plaintiffs' interest in the Kansas City ambulance license was at best a mere expectancy which is not entitled to procedural due process.

In charging that the City violated their due process rights by failing to follow its own rules, however, the plaintiffs seem also to be implying that they have some due process right in the use of a particular *procedure* for granting ambulance service licenses. This argument must be rejected. Even assuming that the City did violate its own rules and acted illegally in giving ASI the sole provider license, the City's actions do not give rise to a procedural due process claim on the part of plaintiffs. In a Western District of Pennsylvania case, *Three Rivers Cablevision, Inc. v. City of Pittsburgh*, 502 F.Supp. 1118 (W.D.Pa.1980), plaintiffs claimed that their procedural due process rights were violated because they were denied a cable television contract in favor of another company which had not followed the detailed bidding procedures set out by the City of Pittsburgh. The Court rejected plaintiffs' argument that they had some due process interest in having the bidding procedure carried out according to the City's own rules.[12] The Court stated:

> Recognition of the fact that the violation of a law is not, ipso facto, a deprivation of due process to all persons affected thereby is fundamental to an understanding of procedural due process.... [T]here can be no property interest in a procedure itself; if there be a protected interest involved here, it is to be found in the *benefit* whose enjoyment is sought to be regulated by the procedure; namely, the award of the contract. (Emphasis in original.)

502 F.Supp. at 1128-29.

Thus, the fact that Kansas City failed to follow its own rules in issuing a license to ASI does not create a procedural due process right in plaintiffs absent a showing of some entitlement to the license itself.

### C. Equal Protection

Plaintiffs allege that their equal protection rights have been violated because the City has established "dual standards" for granting ambulance service licenses, and because the City is seeking to compel plaintiffs to obey its ordinances and regulations, while not so compelling ASI.

As is the case with substantive due process questions, there are two standards of review of equal protection issues. If the challenged law makes a classification based on "suspect criteria" such as race or national origin, the courts will strictly scrutinize the law. As to economic measures, such as the ordinance at issue here, the court will apply only a "rational relationship" test—that is, if the classification created by the law bears a rational relationship to the purpose of the law, then there is no violation of equal protection. As the Supreme Court has stated in *Hughes v. Alexandria Scrap Corporation*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220, 233 (1976), "[A] statutory classification impinging upon no fundamental interest, and especially one dealing only with economic matters, need not be drawn so as to fit with precision the legitimate purposes animating it."

In view of the above standard, plaintiffs' equal protection claims cannot stand. Essential to every licensing system, whether it affects ambulance service or any other industry, is a procedure by which the licensing authority distinguishes between those who qualify for licenses and those who do not qualify for them. If such "classifications" were unconstitutional under the

12. The Court ultimately found that plaintiffs did have some due process property interest in the cable television contract itself. The Court's holding was very limited, however. The Court essentially held that, once the city had decided to go through with the bidding procedure, it was required to act nonarbitrarily in deciding which bidder should be awarded the contract. Even the very limited due process right recognized by the court in *Three Rivers* is not universally accepted. *See, e.g., Estey Corporation v. Matzke*, 431 F.Supp. 468 (N.D.Ill.1976), in which the court stated categorically that a bidder on a government contract had no property interest at all in the contract "until such time as the contract is actually awarded to him." *Id.* at 470. In any case, *Three Rivers* is clearly distinguishable from the case at bar since, in this case, the bidding procedure was simply not used at all. (For a more complete discussion of the *Three Rivers* case, see *Kendrick v. City Council of Augusta, Georgia*, 516 F.Supp. 1134 (S.D.Ga.1981).)

equal protection clause, then no licensing system could exist. No "dual standards" were used in granting the ambulance service license. Rather, it is apparent that Kansas City officials thought plaintiffs could not provide the scope of ambulance service which the City needed, and so no license was offered to them. Even if the City did employ "dual standards" in granting the ambulance service license, however, plaintiffs have alleged nothing which would tend to show that the standards used were not rationally related to the City's purpose of improving ambulance service.

▇▇▇ Plaintiffs' allegation that the City is seeking to compel plaintiffs to obey its ambulance service ordinance while not so compelling ASI cannot form the basis of an equal protection claim. In order to make out a case for discriminatory enforcement, plaintiffs must show (1) that they have been singled out and compelled to comply with the law while others similarly situated have not been so compelled, and (2) that the government's singling out of plaintiffs was based upon an impermissible ground such as race, religion or plaintiffs' exercise of their First Amendment rights. *United States v. Larson*, 612 F.2d 1301 (8th Cir. 1980), *cert. denied* 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980); *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962).

Plaintiffs cannot meet these two requirements. ASI, unlike Gold Cross and Transfer, has a city license to operate. Kansas City is not discriminating between two similarly situated companies. Rather, Kansas City is distinguishing between the company which has a license and those which do not. Such "unequal treatment" is the very purpose of the City's ambulance ordinance—as it is the purpose of virtually every licensing ordinance in effect.

Plaintiffs also cannot show the second element of the discriminatory enforcement test. Plaintiffs have not alleged that Kan-

sas City's choice to enforce its ordinance against them is based on any impermissible ground. Rather, it is apparent that the City's enforcement actions are based on plaintiffs' failure to have the required city license.[13]

For the foregoing reasons, summary judgment must be granted for defendants on plaintiffs' Counts IV and V.

## CONCLUSION

We are aware that "courts do not lightly enter summary judgment on the merits in antitrust cases." *Willmar Poultry Co. v. Morton-Norwich Products, Inc.*, 520 F.2d 289, 292 (8th Cir. 1975), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976). In this case, however, there is no genuine issue as to any material fact, and the moving parties are therefore entitled to partial summary judgment as a matter of law. As plaintiffs themselves state, "MAST's counsel admitted . . . that the defendants have done what plaintiffs say they have done. The only question is whether they are subject to the law." Plaintiffs' Brief of December 15, 1982, at page 2. We have carefully examined the pleadings, briefs and exhibits filed in this case, along with the transcript of the hearing held before Judge Scott O. Wright on March 13, 16 and 17, 1981, and have concluded that this is a proper case for partial summary judgment.

It is therefore

ORDERED that on plaintiffs' Counts I, II, and III summary judgment is granted against plaintiffs and for defendants City of Kansas City, MAST, Jack Stout and Fourth Party, Inc. It is further

ORDERED that on plaintiffs' Counts I, II and III, summary judgment is denied as to defendants Hadley Reimal, Lawrence Hughes, June and Eugene DeSaulniers, and ASI. It is further

13. Apparently at one point in 1981 ASI was operating without a city license because the license had been allowed to lapse. Plaintiffs could thus contend that during the period ASI was without a license it was "similarly situat-

ed" with Gold Cross and Transfer. However, this would satisfy only the first of the two elements needed for a valid discriminatory enforcement claim.

ORDERED that on plaintiffs' Counts IV and V, summary judgment is granted against plaintiffs and for all defendants.

The Court finds further that this case is a proper one for certification under Rule 54(b), Fed.R.Civ.P., which allows the District Court to direct the entry of a final judgment as to one or more claims or parties in a case which contains multiple claims or parties. We find that there is no just reason for delay as to those portions of plaintiffs' case on which summary judgment has been granted. The legal issues involving these parties and claims are separate, distinct and independent of the issues involved in the claims against the remaining defendants. Those portions of plaintiffs' case on which summary judgment is being granted involve questions of the application of the state action exemption and the Tenth Amendment to the actions of the City of Kansas City, MAST and their agents. They also involve the application of 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution. None of these issues will affect plaintiffs' claims against the remaining defendants, four individuals and a corporation, since these issues are of importance only when a governmental entity is a party.

We realize that certification under Rule 54(b) should not be lightly granted. However, the particular facts of this case lead us to conclude that this is a proper case for the direction of entry of final judgment under that rule. *Curtiss-Wright Corporation v. General Electric Company,* 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980). It is therefore

ORDERED that final judgment shall be entered against plaintiffs and for defendants City of Kansas City, MAST, Jack Stout, and Fourth Party, Inc., as to plaintiffs' Counts I, II, III, IV and V. It is further

ORDERED that final judgment shall be entered against plaintiffs and for defendants Hadley Reimal, Lawrence Hughes, June and Eugene DeSaulniers and ASI on plaintiffs' Counts IV and V.