**GOLD CROSS AMBULANCE AND TRANSFER and Standby Service, Inc., Appellants,**

v.

**CITY OF KANSAS CITY, Metropolitan Ambulance Services Trust, Hadley Reimal d/b/a Ambulance Services, Lawrence Hughes d/b/a Ambulance Services, June DeSaulniers d/b/a Ambulance Services, Eugene DeSaulniers d/b/a Ambulance Services, Ambulance Services, Inc., Fourth Party, Inc. and Jack Stout, Appellees.**

**No. 82–1913.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 16, 1983.

Decided April 26, 1983.

George E. Leonard, Russell S. Jones, Jr., Shughart, Thomson & Kilroy, P.C., Kansas City, Mo., for Metropolitan Ambulance Services Trust, Ambulance Service, Inc., Jack Stout and Fourth Party, Inc.

Sam B. Mumma, William D. Geary, Asst. City Attys., Kansas City, Mo., for City of Kansas City, Mo.

Paden, Welch, Martin, Albano & Graeff, P.C., Michael W. Manners, C. Robert Buckley, Independence, Mo., for appellants.

Before HEANEY, McMILLIAN and ARNOLD, Circuit Judges.

HEANEY, Circuit Judge.

The issue we face here is whether the City of Kansas City, the Metropolitan Ambulance Services Trust (MAST), and various other defendants[1] violated the federal and state antitrust laws and the United States Constitution by implementing a single-operator ambulance system to provide all of the city's emergency and nonemergency service. We hold that Kansas City, MAST, and the consultants they retained are shielded from federal and state antitrust liability because they established the municipal ambulance system pursuant to state authorization and a clearly articulated and affirmatively expressed state policy to displace free competition in the ambulance business. We further hold that none of the defendants deprived the plaintiffs of their constitutional rights to due process. The district court's judgment, therefore, is affirmed.

## I.

### BACKGROUND

Kansas City, Missouri, has established a municipal ambulance system under which a municipal trust, MAST, contracts with a single private operator to provide all of the ambulance service—both emergency and nonemergency—within the city. In November, 1979, MAST awarded the initial

---

1. In addition to Kansas City and MAST, the plaintiffs named as defendants Ambulance Service, Inc. (ASI), the current holder of the city's exclusive ambulance license; four individual shareholders of ASI who had consolidated their previously private companies; Jack Stout, a consultant who helped develop the city's ambulance system; and Stout's company, Fourth Party, Inc.

exclusive contract to Ambulance Service, Inc. (ASI), a corporation which had been formed earlier that year by the merger of the five existing private ambulance companies located in Kansas City. MAST has since renewed this contract and ASI continues to be Kansas City's exclusive provider of ambulance service.

Because ASI holds the city's sole ambulance license, other ambulance companies in the metropolitan area are denied access to most of the Kansas City market. They can transport into Kansas City patients whom they have picked up outside the city limits, and they can travel through the city on their way to other municipalities. They cannot, however, pick up any patients within the Kansas City borders.

Dissatisfied with these restrictions, plaintiffs Gold Cross Ambulance, Inc. (Gold Cross), and Transfer and Standby Services, Inc. (Transfer)—two private companies located in suburban Independence, Missouri— brought this five-count action, alleging that the defendants had violated federal and state antitrust laws and deprived the plaintiffs and Kansas City residents of various constitutional rights.[2]

On May 7, 1982, the district court granted summary judgment in favor of defendants Kansas City, MAST, Jack Stout and Fourth Party, Inc., on the plaintiffs' antitrust claims, but denied it to the individual shareholders of ASI on these counts. 538 F.Supp. 956, 967–970 (W.D.Mo.1982). The court also granted summary judgment in favor of all defendants on the plaintiffs' constitutional claims. *Id.* at 970–973. The plaintiffs now appeal.[3]

## II.

### FACTS

Kansas City for many years provided emergency ambulance services to its citizens by operating a public ambulance system through the Kansas City General Hospital and, later, through the city Fire Department. In the early 1970s, however, Kansas City began to contract with five competing, private companies for emergency ambulance service. A central dispatch center allocated calls among the various companies on a "round-robin" basis. In 1973, the dispatch center adopted a policy of dispatching the closest available ambulance to the scene of the accident, regardless of which company owned the vehicle.

In 1978, a controversy developed concerning the slow response time by the private ambulance companies to emergency calls. As a result, the city formed a Public Safety Improvement Committee to investigate alternatives for improving emergency medical service. The Committee reported its findings to the city council on March 21, 1979, and recommended that the city adopt a publicly controlled ambulance system which utilized a single provider for both emergency and nonemergency services. Within two weeks, the city council approved a resolution committing Kansas City to such a system. In April, 1979, the city retained a consulting firm to study the implementation of a single-provider system.

Jack Stout, the consultant, was the recognized developer of the so-called "public utility model" of ambulance service in which a single operator replaces competing private companies. This model is designed to eliminate the incentive created by free-market delivery of ambulance service by private companies to neglect emergency ambulance service in favor of the more profitable nonemergency business.

This incentive to neglect emergency service arises from the cost structure of the

---

2. The plaintiffs originally filed their action in state court, alleging only Missouri antitrust law violations and constitutional claims under the fourteenth amendment and 42 U.S.C. § 1983. Defendant MAST removed the case to federal court, and filed a counterclaim alleging that the plaintiffs violated the federal antitrust laws. The plaintiffs then amended their complaint to include their Sherman Act claims.

3. The appeal is properly before this Court because the district court directed entry of final judgment pursuant to Fed.R.Civ.P. 54(b) on plaintiffs' claims against which it granted summary judgment.

ambulance business. The fixed cost of providing emergency service is very high because expensive advanced life support equipment is required and because sufficient capacity to meet peak demand within an adequate response time must be maintained, even though that full emergency capacity is seldom utilized. In contrast, the cost of handling nonemergency ambulance service with the idle excess capacity is low. Moreover, the fee-collection rate for nonemergency service is substantially higher than for emergency service. Thus, nonemergency calls are significantly more profitable than emergency calls, and private ambulance companies operating in an unregulated market have a strong incentive to concentrate on providing nonemergency service rather than quick, high quality emergency care.

To resolve these problems, the public utility model advocates the following approach: first, a city contracts with a single operator to provide all municipal ambulance service within medical care and response time standards set by public officials. The city then collects from each patient the fee for services rendered by the company. If the ambulance company fulfills its contractual requirements, it receives payment regardless of whether the city has been able to collect all fees due. If the city collects insufficient fees to cover the amount owed to the ambulance company, the city makes up the deficit as a government subsidy. Finally, the city owns all the ambulance service equipment to prevent service from being interrupted if the operator encounters financial difficulty.

Thus, the public utility model, in theory at least, eliminates the incentive to favor nonemergency calls because the operator is paid only the contractual sum and this payment is not conditioned on the collection of user fees. For this model to be economically feasible, however, the municipally-licensed operator should be the only ambulance service allowed to do business in the city. If other private companies are permitted to operate in the city, they will retain the strong incentive to take the high profit nonemergency calls and leave the less-profitable emergency business to the city system.

In September, 1979, the Kansas City council passed an ordinance formally adopting the public utility model for city ambulance service and creating a nonprofit public trust, MAST, to implement and manage the new system. Several problems prevented Kansas City from implementing its plan, however. Missouri law requires all ambulance service operators to have a state-issued license,[4] which MAST did not possess. Moreover, MAST did not own the equipment necessary to provide full ambulance service to the city. Thus, MAST could not provide a bidder with either the license or the equipment necessary to implement the public utility model.

Consequently, in October, 1979, the city council repealed its September ordinance. The successor ordinance, while retreating from full implementation of the public utility model, reiterated Kansas City's commitment to the concept. Thereafter, MAST contracted with ASI, which possessed the requisite state license and equipment, to provide the city's ambulance service. MAST apparently issued the exclusive municipal license to ASI without complying with the competitive bidding procedures required by city ordinance because, according to defendant Kansas City, ASI was the only state-licensed company in the area that possessed sufficient equipment to provide ambulance service on a single-provider basis.

Eventually, in December, 1980, the city council directed MAST to fully implement the public utility model.[5] In September, 1981, MAST purchased all of ASI's outstanding stock, thereby obtaining the company's equipment and state license. Thereafter, on December 17, 1981, the city council passed Ordinance 53539, which directed

---

**4.** Mo.Rev.Stat. §§ 190.105, 190.125.

**5.** Shortly thereafter, Gold Cross and Transfer filed their action in state court. After the plaintiffs commenced their lawsuit, no further action apparently was taken on the license applications they had pending with MAST.

MAST to fully implement the public utility model.[6]

Thus, pursuant to Ordinance 53539, Kansas City has adopted a publicly controlled, single-operator ambulance system. The plaintiffs challenge that system, contending that the defendants have violated the federal and state antitrust laws and the United States Constitution by implementing it.

## III.

## ANTITRUST CLAIMS

The district court found that the state action doctrine shields defendants Kansas City, MAST, Jack Stout and Fourth Party, Inc., from liability under the federal antitrust laws.[7]

### A. The State Action Doctrine.

In *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court first addressed the question of whether the federal antitrust laws prohibit a state from exercising its sovereign powers to impose certain anticompetitive restraints. It held that a marketing program enacted by the California legislature to create price supports for raisins was exempt from challenge under the Sherman Act because the program "derived its authority * * * from the legislative command of the state." *Id.* at 350, 63 S.Ct. at 313. The Court stated:

> We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activi-

ties directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

*Id.* at 350–351, 63 S.Ct. at 313–314.

Subsequent decisions have refined the *Parker* state action doctrine. *E.g., Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Bates v. State Bar of Arizona,* 433 U.S. 355, 97 S.Ct. 2691, 2694, 53 L.Ed.2d 810 (1977). In *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Supreme Court faced the question of whether the state action doctrine protected a municipality from federal antitrust liability. A plurality of four justices rejected the claim that the state action doctrine extended to "all governmental entities, whether state agencies or subdivisions of a State * * * simply by reason of their status as such." *Id.* at 408, 98 S.Ct. at 1134. The justices nonetheless recognized that municipalities are instrumentalities of the state, and their actions may reflect state policy. *Id.* at 413, 98 S.Ct. at 1136. The plurality thus held that "the Parker doctrine exempts only anticompetitive conduct engaged in * * * by [municipalities], pursuant to state policy to displace competition with regulation or monopoly public service." *Id.*

---

**6.** Ordinance 53539, of course, requires MAST to contract with a single operator to provide all of Kansas City's ambulance service. In addition, it establishes an Emergency Physicians Advisory Board which appoints an ambulance service Medical Director and makes recommendations for the improvement of ambulance service. The ordinance also gives the city's Director of Health authority to promulgate rules, regulations and standards necessary to implement the public utility system. The Director of Health is empowered to establish standards for clinical performance, patient care, response time and medical protocols, and to develop procedures for medical control over the delivery of advanced life support by ambulance personnel. Finally, the ordinance requires all am-

bulance drivers, attendants, and dispatchers to obtain permits from the Director of Health.

**7.** The district court held that because the state action doctrine exempted these four defendants from liability under the federal antitrust laws, it also exempted them under Missouri's antitrust statutes. 538 F.Supp. 956, 970 (W.D.Mo.1982). It held that Stout and Fourth Party, Inc., shared the state action exemption of Kansas City and MAST because they did nothing beyond what they were authorized to do by the city and MAST. *Id.* at 969–970. The plaintiffs do not challenge either of these conclusions by the court below; rather, they contend that it erred in holding that the state action doctrine is applicable here.

The plurality observed that a state policy to displace competition could not be found "in the absence of evidence that the state authorized or directed a given municipality to act as it did." *Id.* at 414, 98 S.Ct. at 1137. It concluded, however, that "an adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is 'found from the authority given a governmental entity to operate in a particular area, that the legislature *contemplated* the kind of action complained of.'" *Id.* at 915, 98 S.Ct. at 1138 (citation omitted) (emphasis added).

Recently, in *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982), the Supreme Court had another opportunity to address the application of the state action doctrine to municipal conduct. It held that the doctrine did not shield the city from antitrust liability when the regulation in question was based only on the state's broad grant of home rule power to the municipality. *Id.*

In rejecting Boulder's state action defense, the Court held that the city failed to establish the requirement that its challenged restraint constituted either "the action of the State of Colorado itself in its sovereign capacity, * * * [or] municipal action in furtherance or implementation of clearly articulated and affirmatively expressed state policy." *Id.* at 52, 102 S.Ct. at 841 (citations omitted). The Court emphasized that this standard for determining the applicability of the state action doctrine was fully consistent with the one adopted by the plurality in *City of Lafayette v. Louisiana Power & Light Co., supra.*[8]

B. The Present Case.

There is no claim here that Ordinance 53539 enacted by Kansas City constitutes the action of the State of Missouri itself in its sovereign capacity. Thus, the issue is whether it constitutes action in furtherance or implementation of a clearly articulated and affirmatively expressed state policy. *Community Communications Co. v. City of Boulder, supra,* 455 U.S. at 52, 102 S.Ct. at 841.

An expression of state policy that is sufficient to establish *Parker* immunity is comprised of two elements: The legislature must have authorized the challenged activity, and it must have done so with an intent to displace competition. *See* Areeda, Antitrust Law ¶ 212.3a, at 53 (1982 Supp.). *See also Community Communications Co. v. City of Boulder, supra,* 455 U.S. at 51–52, 102 S.Ct. at 840–841; *City of Lafayette v. Louisiana Power & Light Co., supra,* 435 U.S. at 415, 98 S.Ct. at 1138.

The first element of this test is plainly satisfied here. The State of Missouri has enacted a comprehensive regulatory scheme which expressly authorizes the various elements of the single-operator ambulance system adopted by Kansas City. *See supra,* at 1009–1010 & n. 6 (describing the city ambulance system). The state permits cities to provide ambulance service to its citizens, to acquire the necessary equipment, to "contract with one or more" operators to provide the ambulance service, and to promulgate rules to regulate the provision of that service. Mo.Rev.Stat. § 67.-300.[9]

---

8. The Court stated:
[The view of the *Lafayette* plurality that municipal conduct is not exempt unless it is "pursuant to a state policy to displace competition"] was simply a recognition that a State may frequently choose to effect its policies through the instrumentality of its cities and towns. It was stressed, however, that the "state policy" relied upon would have to be "clearly articulated and affirmatively expressed." [435 U.S.] at 410 [98 S.Ct. at 1135]. * * * This standard has since been adopted by a majority of the Court. *New Motor Vehicle Board of California v. Orrin*

*W. Fox Co.,* 439 U.S. 96, 109 [99 S.Ct. 403, 411, 58 L.Ed.2d 361] (1978); *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105 [100 S.Ct. 937, 943, 63 L.Ed.2d 233] (1980). [Footnote omitted.] *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 50–51, 102 S.Ct. 835, 840, 70 L.Ed.2d 810 (1982).

9. Section 67.300 of Missouri Revised Statutes provides:
1. Any county, city, town or village may provide a general ambulance service for the purpose of transporting sick or injured per-

The state has enacted additional laws concerning ambulance service in Chapter 190 of Missouri Revised Statutes.[10] This chapter permits municipalities to impose their own restrictions on ambulance service in addition to those imposed by the state. Section 190.105.4 provides that the issuance of a state license does not authorize operation of an ambulance "without a franchise in any county, municipality or political subdivision which has enacted an ordinance making it unlawful to do so." Section 190.-105.5 provides that municipalities may adopt ambulance service ordinances that do not conflict with state law.

The foregoing statutes plainly establish that the first element of the *Parker* doctrine is present here: Missouri has authorized Kansas City's single-operator ambulance system. The second and more difficult question is whether Missouri has intended to displace competition with regulation or monopoly service. *See supra,* at 1011. The district court found that such an intent existed, stating that "the state's policy [was] to place anticompetitive restraints on ambulance service," and that its regulatory scheme "clearly indicates an intent to regulate the provision of ambulance service on the basis of public need rather than to allow unbridled competition." 538 F.Supp. at 965.

█ The Supreme Court has made clear that "a specific, detailed legislative authorization" of monopoly service need not exist to infer the necessary state intent. *City of Lafayette v. Louisiana Power & Light Co., supra,* 435 U.S. at 415, 98 S.Ct. at 1138. It is sufficient that " 'the legislature contemplated the kind of action complained of.' " *Id.* (citation omitted).[11] In other words, a

---

sons to a hospital, clinic, sanatorium or other place for treatment of the illness or injury, and for that purpose may

    (1) Acquire by gift or purchase one or more motor vehicles suitable for such purpose and may supply and equip the same with such materials and facilities as are necessary for emergency treatment, and may operate, maintain, repair and replace such vehicles, supplies and equipment;

    (2) Contract with one or more individuals, municipalities, counties, associations or other organizations for the operation, maintenance and repair of such vehicles and for the furnishing of emergency treatment;

    (3) Employ any combination of the methods authorized in subdivisions (1) and (2) of this section.

    2. The municipality or county shall formulate rules and regulations for the use of the equipment and may fix a schedule of fees or charges to be paid by persons requesting the use of the facilities and provide for the collection thereof.

    \*     \*     \*     \*     \*     \*

10. Section 190.105.1 requires all ambulance operators to be licensed by the State of Missouri, and Section 190.125 requires an annual showing of need for each state ambulance license issued. Sections 190.115 and 190.120 set out the equipment and the kind of insurance coverage which each licensed ambulance must have. Section 190.145 lists the qualifications which ambulance service personnel must meet, and Section 190.175 details the records which each ambulance license holder must maintain.

11. The plaintiffs contend that state authorization or contemplation of municipal action is insufficient to satisfy the state action doctrine; rather, they apparently suggest that the state must compel or command the city's action. We disagree. *Accord Town of Hallie v. City of Eau Claire,* 1983–1 Trade Cases ¶ 65,227, at 69,337 (7th Cir. Feb. 17, 1983).

    In *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 54–57, 102 S.Ct. 835, 842–844, 70 L.Ed.2d 810 (1982), the Supreme Court did not require state compulsion of the city's conduct as a prerequisite to state action immunity. In fact, the *Community Communications* Court, *id.* at 55–56, 102 S.Ct. at 843–844, repeated with approval the language regarding state authorization or contemplation of the challenged restraint used by the plurality in *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). *See* Areeda, Antitrust Law ¶ 212.5, at 59–61 (1982 Supp.) (concluding that state need not compel the challenged restraint as a prerequisite to application of the *Parker* doctrine to municipal conduct).

    In fact, the Supreme Court has used language demanding state compulsion only in cases involving private defendants. *E.g., Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). In any event, in its most recent case involving private conduct, the Supreme Court required, as prerequisites for *Parker* immunity, a state policy to displace competition and active state supervision rather than state compulsion of the challenged practice. *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980).

sufficient state policy to displace competition exists if the challenged restraint is a necessary or reasonable consequence of engaging in the authorized activity. Areeda, Antitrust Law, *supra*, ¶ 212.3, at 54; Areeda, *Antitrust Immunity for "State Action" After Lafayette*, 95 Harv.L.Rev. 435, 446 (1981).

Section 67.300 of Missouri Revised Statutes, which permits a city to "contract with one or more" operators to provide ambulance service, plainly contemplates the conduct about which the plaintiffs complain here. Because monopoly service is the necessary consequence of having only one municipal ambulance operator as authorized by Missouri law, this statute alone supports the district court's finding that the state intended to displace unregulated competition in the ambulance industry.

Moreover, the state has also enacted its own anticompetitive scheme for regulating ambulance service in Missouri, which applies in addition to any municipal regulation. Mo.Rev.Stat. §§ 190.100 *et seq.* This chapter requires all ambulance operators and vehicles to be licensed by the state; mandates the necessary equipment and insurance coverage for all ambulances; details the types of records that all ambulances must keep; and provides that *no* ambulance may be licensed without an annual determination by the state license officer that "public convenience and necessity require the proposed ambulance service." *See* note 10, *supra.* Indeed, the Missouri Supreme Court, in *City of Raytown v. Danforth*, 560 S.W.2d 846, 848 (Mo.1977) (en banc), expressly held that Mo.Rev.Stat. § 67.300, which authorizes cities to set up their own ambulance systems, does *not* allow a city to circumvent the state's licensing and regulatory requirements contained in Mo.Rev.Stat. §§ 190.100 *et seq.* The "thrust of the Licensing Law," the court concluded, was "toward control of destructive competition and improvement of service." *Id.* at 849.

Accordingly, we believe the Missouri legislature has evinced its intent to displace competition in the ambulance industry, and that the state action doctrine thus applies in this case. The plaintiffs, however, vigorously argue that the Supreme Court's decision in *Community Communications Co. v. City of Boulder, supra,* renders the doctrine inapplicable here. In that case, the city council passed an ordinance prohibiting a cable television operator in Boulder from expanding its business for three months while the council drafted an ordinance to regulate the cable television market in the city. 455 U.S. at 45–46, 102 S.Ct. at 837–838. The Supreme Court held that Boulder could not invoke the state action doctrine because the home rule amendment to the Colorado constitution upon which the city based its moratorium was not a sufficient "clear articulation and affirmative expression" of a state policy to restrain trade in the cable television business. *Id.* at 52–56, 102 S.Ct. at 841–843. The Court reasoned:

> [P]lainly the requirement of "clear articulation and affirmative expression" is not satisfied when the State's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive. A State that allows its municipalities to do as they please can hardly be said to have "contemplated" the specific anticompetitive actions for which municipal liability is sought.

*Id.* at 55, 102 S.Ct. at 843 (emphasis included).

The plaintiffs contend that Missouri's position in Mo.Rev.Stat. § 67.300 is similarly one of "mere neutrality" regarding municipally operated ambulance service because it permits cities "to contract with one or more" providers. We disagree. In *Community Communications,* the Supreme Court emphasized that the home rule provision on which the city relied did not even address the subject of cable television and no other state cable television regulation existed.[12] *See* Note, *Municipalities and the*

---

**12.** The Supreme Court stated:

Nor can those actions [by the city] be truly described as "comprehended within the pow-

ers *granted*," since the term, "granted," necessarily implies an affirmative addressing of the subject by the State. The State did not

*Antitrust Laws: Home Rule Authority is Insufficient to Ensure State Action Immunity,* 35 Vand.L.Rev. 1041 (1982).

In this case, there has been an "affirmative addressing of the subject by the State," the decisive factor missing in *Community Communications.* Indeed, sections 67.300 and 190.100 *et seq.* of Missouri Revised Statutes show that the state has not only *affirmatively addressed* the subject of ambulance service on the local level, but has "clearly articulated and affirmatively expressed" a state policy which authorizes Kansas City to provide ambulance service to its residents by means of a single provider. The state action test articulated by the Supreme Court in *Lafayette* and *Community Communications,* therefore, is satisfied.

■ The district court, relying on *California Liquor Dealers Ass'n. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 104–106, 100 S.Ct. 937, 942–943, 63 L.Ed.2d 233 (1980), concluded that the state action doctrine also required that the challenged restraint must be actively supervised by the state. We do not agree with that conclusion.[13]

The Supreme Court has required active state supervision of the challenged restraint only in cases in which the defendants were private entities or individuals. *See, e.g., California Retail Liquor Dealers Ass'n. v. Midcal Aluminum, Inc., supra,* 445 U.S. at 99, 100 S.Ct. at 940; *Cantor v. Detroit Edison Co., supra,* 428 U.S. at 582, 96 S.Ct. at 3113; *Goldfarb v. Virginia State Bar, supra,* 421 U.S. at 775, 95 S.Ct. at 2007. In this context, the state supervision requirement is intended to control the potential for abuse created by authorizing private persons to make anticompetitive decisions and

to insure that those decisions are consistent with the clearly articulated and affirmatively expressed state policy at stake. Because municipal officials generally are politically accountable to the citizens they represent for their decisions regarding the challenged restraint, state supervision is not as necessary to prevent abuse as in the private context. *See Town of Hallie v. City of Eau Claire,* 1983–1 Trade Cases ¶ 65,-227, at 69,338–69,339 (7th Cir. Feb. 13, 1983).

Moreover, because the *Parker* doctrine requires that the state delegate to the local government the authority to engage in the challenged conduct, state supervision of Kansas City's conduct is unnecessary to find state action. *Id.* at 69,339. As a leading commentator recently noted:

> requiring state authorization for local conduct is analogous to requiring active supervision of private conduct; it tests whether challenged local activity is truly state action and therefore entitled to immunity.

Areeda, Antitrust Law, *supra,* ¶ 212.2a, at 47 (footnote omitted).

We also believe that requiring active state supervision over a municipal function such as the one present here is unwise. The State of Missouri has authorized its municipalities to provide ambulance service because it believes that such service is a proper local activity. To require the state to supervise Kansas City's ambulance system once the city has elected to exercise its authority to establish the system makes little sense. As the dissent in *Community Communications Co. v. City of Boulder, supra,* 455 U.S. at 70–71 & n. 6, 102 S.Ct. at 850–851 & n. 6 (Rehnquist, J., dissenting),

---

do so here: The relationship of the State of Colorado to Boulder's moratorium ordinance is one of precise neutrality. As the majority in the Court of Appeals below acknowledged: "[W]e are here concerned with City action in the absence of any regulation whatever by the State of Colorado. Under these circumstances there is no interaction of state and local regulation. We have only the action or exercise of authority by the City."
*Community Communications Co. v. City of Boulder, supra,* 455 U.S. at 56, 102 S.Ct. at 843 (citation omitted) (emphasis included).

**13.** The provision of ambulance service by Kansas City is a traditional governmental function designed to protect public health and safety. *See* Note, *The Supreme Court, 1981 Term,* 96 Harv.L.Rev. 268–278 (1982). We need not address the question of whether municipal conduct which is outside the scope of such a traditional governmental function and which may pose a more significant threat to competition may require active state supervision to qualify for protection under the *Parker* doctrine. *Id.*

observed in concluding that the state supervision requirement does not apply to municipal conduct, "[i]t would seem rather odd to require municipal ordinances to be enforced by the State rather than the city itself." [14] Finally, requiring state supervision could force the state and its municipalities to engage in duplicative, wasteful regulation and could erode the local autonomy that the state has sought to encourage. *See Town of Hallie v. City of Eau Claire, supra,* 1983–1 Trade Cases at 69,339.

Accordingly, we believe that the state action doctrine is applicable in this case regardless of whether Missouri actively supervised Kansas City's implementation of Ordinance 53539.[15] Therefore, the district court's finding that the state action doctrine exempts defendants Kansas City, MAST, Stout, and Fourth Party, Inc., from Sherman Act liability is affirmed.[16]

## IV.

## CONSTITUTIONAL CLAIMS

Counts IV and V of the plaintiffs' complaint allege various violations of their rights to substantive due process, procedural due process, and equal protection. The district court granted summary judgment in favor of all defendants on these claims.[17]

■ The plaintiffs allege that they have been denied substantive due process because Kansas City's ambulance system deprives them of the freedom to contract with potential customers and freedom to engage in a lawful business. The district court rejected these contentions, holding that a rational basis existed for Ordinance 53539. We affirm this holding.

■ We agree with the court below that the challenged ordinance is designed to promote the public health, safety and welfare; and that it does not infringe on any fundamental constitutional right. There is no absolute right to contract free of state regulation under the police power. *See, e.g., New Motor Vehicle Board v. Orrin W. Fox Co.,* 439 U.S. 96, 106–107, 99 S.Ct. 403, 410–411, 58 L.Ed.2d 361 (1978).

■ Because the challenged ordinance does not involve a fundamental right or suspect class, the defendants need only demonstrate that the ordinance is designed to accomplish an objective within the government's police power, and that a rational relationship existed between the ordinance's provisions and its purpose. *See Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 813–814, 96 S.Ct. 2488, 2499–2500, 49 L.Ed.2d 220 (1976). The ordinance "need not be drawn so as to fit with precision the legitimate purposes" underlying it. *Id.*

The court below found that Ordinance 53539 satisfied the rational basis test. It stated:

The Kansas City ordinance challenged by plaintiffs meets the "rational relationship" standard. Kansas City's stated purpose in passing this ordinance was to protect public health and safety by improving Kansas City's ambulance service. Kansas City officials were concerned that competition in the ambulance service industry was harming the public. Setting up the monopoly public utility model, in which the receipt of payment for ambulance service is not based on a company's

---

**14.** Because the majority in *Community Communications Co. v. City of Boulder, supra,* found that the challenged restraint was not in furtherance of a clearly articulated and affirmatively expressed state policy, it explicitly declined to determine whether the "active state supervision" requirement applied to municipal conduct. 455 U.S. at 51 n. 14, 102 S.Ct. at 840 n. 14.

**15.** In any event, the district court's finding that adequate state supervision of Kansas City's ambulance system existed here was not clearly erroneous.

**16.** Because we hold that the state action doctrine shields these defendants from antitrust liability, we need not address the issue of whether the plaintiffs' Sherman Act claims against them are barred by the tenth amendment to the United States Constitution.

**17.** The plaintiffs do not appeal from the district court's finding that they were not denied equal protection under the fourteenth amendment.

ability to compete for business, is a reasonable means of improving service. Kansas City's ordinance is not arbitrary or capricious; it is reasonably related to the purpose it seeks to achieve.

538 F.Supp. at 970–971.

After carefully reviewing the record and briefs, and hearing oral argument, we find no error in this conclusion. It therefore is affirmed.

■ The plaintiffs also contend that the citizens of the Kansas City metropolitan area have been deprived of their right to select the ambulance company to provide service to them. The district court found that the plaintiffs lacked standing to assert this claim. We agree.

A litigant "may not claim standing * * * to vindicate the constitutional rights of some third party." *Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953). The plaintiffs acknowledge this general rule, but they claim that they have standing under the exception recognized in *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

In *Singleton,* the Supreme Court held that a physician had standing to assert the rights of women patients to be free from governmental interference with their decision concerning abortion. *Id.* at 118, 96 S.Ct. at 2876. In so holding, the Court emphasized two factors: (1) the relationship of the litigant to the persons whose rights the litigant seeks to further; and (2) the ability of the third parties to assert their own rights. *Id.* at 114–116, 96 S.Ct. at 2874–2875.

In this case, the plaintiffs would not be effective proponents of the rights of the citizens of Kansas City. There is no close, confidential relationship between the plaintiffs and Kansas City residents. Moreover, the interests of the two are in substantial conflict. Gold Cross and Transfer are principally interested in operating their businesses profitably, while Kansas City-area residents are principally concerned with receiving high quality ambulance service at

the lowest possible cost. *Cf. Singleton v. Wulff, supra,* 428 U.S. at 113–117, 96 S.Ct. at 2873–2875.

In addition, the factors in *Singleton* that made it difficult for the third parties to assert their rights are not present here. Unlike the abortion decision in *Singleton,* the right in question here does not involve an intimate, private decision, nor is it affected by concerns of imminent mootness. *Cf. id.* Accordingly, we agree with the district court that the plaintiffs lacked standing to assert any rights possessed by the citizens of the Kansas City area.

Finally, the plaintiffs allege that their procedural due process rights were violated because Kansas City issued its exclusive ambulance license to ASI and renewed that license without following the requirements of its ordinances and without giving the plaintiffs notice and an opportunity to be heard. The court below held that the plaintiffs were not entitled to any procedural due process because they possessed no protected property or liberty interest.

■ To sustain their procedural due process claim, the plaintiffs must first establish that they possessed "a legitimate claim of entitlement" to the ambulance license issued by Kansas City. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The plaintiffs could demonstrate such a claim of entitlement by showing that they had a reasonable expectancy of receiving the municipal license based upon state or local statutes or regulations, or upon an express contract or mutual understanding with the defendants. *See id.* at 577–578, 92 S.Ct. at 2709–2710; *Perry v. Sindermann,* 408 U.S. 593, 600–603, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972); *Brockell v. Norton,* 688 F.2d 588, 590–591 (8th Cir.1982). Gold Cross and Transfer, however, have pointed to nothing which gives them a legitimate claim of entitlement to the Kansas City ambulance license.[18] Their unilateral ex-

---

**18.** To the extent that the district court's opinion suggests that a legitimate claim of entitle-

ment can never arise from the procedures es-

pectation of being awarded a license is insufficient to sustain their procedural due process claim. *Board of Regents v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709. Thus, the district court's grant of summary judgment against that claim is affirmed.

## V.

## CONCLUSION

We hold that the district court did not err in granting summary judgment in favor of defendants Kansas City, MAST, Jack Stout, and Fourth Party, Inc., on the plaintiffs' antitrust claims and in favor of all defendants on the plaintiffs' constitutional claims. Accordingly, that judgment is affirmed.

tablished in the statutes or regulations adopted by a state or its subdivisions, we disagree. *See, e.g., Wilson v. Robinson,* 668 F.2d 380, 382–383 (8th Cir.1981) (county ordinance requiring two weeks notice prior to the termination of nonprobationary sheriff's deputies creates a property interest protectable under the fourteenth amendment). We hold only that in

this case, Gold Cross and Transfer have failed to demonstrate that there are any Missouri or Kansas City statutes or regulations, or alternatively any agreement between the various parties, which gave the plaintiffs a legitimate claim of entitlement to a municipal ambulance license.