758 F.2d 1260
 Mary IRVING, Patrick Pumpkin Seed, Eileen Bissonette as
Guardian for Duane Cross, Miguel Cross, Hope
Cross, Anthony Cross, Faith Cross, and
all others similarly situated,
Appellants,
v.
William P. CLARK, Secretary, Department of Interior and his
Agents, Assigns, and Successors in Office, Appellees.
 No. 84-1094.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 8, 1984.
Decided March 29, 1985.
 
 Yvette Hall War Bonnet, Mission, S.D., for appellants.
 Blake A. Watson, Dept. of Justice, Washington, D.C., for appellees.
 Before HEANEY, Circuit Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 The issue before us is the constitutionality of 25 U.S.C. Sec. 2206 (1982),[1] which provides that de minimis shares of land allotted in trust to individual members of the Oglala Sioux Tribe may not pass by intestacy or devise but instead escheat to that tribe. The designated heirs and devisees of three deceased tribe members argue that this statute deprives them of property without just compensation in violation of the fifth amendment. The district court found the provision constitutional. We reverse.
 
 
 2
 The lands at issue in this case were allotted to individual members of the Oglala Sioux Tribe, to be held in trust for those individuals by the United States, pursuant to congressional Indian land policies of the late 1800's and early 1900's. Act of Mar. 2, 1889, ch. 405, 25 Stat. 888.[2] These and subsequent policies, however, resulted in the lands frequently being jointly owned by such large numbers of individuals with undivided fractional interests that the tracts could not be made productive. In an attempt to alleviate this problem, Congress in 1983 enacted the Indian Land Consolidation Act, Pub.L. No. 97-459, tit. II, 96 Stat. 2515, 2517 (1983), 25 U.S.C. Secs. 2201-2211 (1982) (amended by Act of Oct. 30, 1984, Pub.L. No. 98-608, 98 Stat. 3171). See H.R.Rep. No. 908, 97th Cong., 2d Sess. 13, reprinted in 1982 U.S.Code Cong. & Ad.News 4415, 4422-23; S.Rep. No. 632, 98th Cong., 2d Sess. 2-3, 10-11 (1984), U.S.Code Cong. & Admin.News 5470, 5471-5473, 5479-5480; see generally Too Little Land, Too Many Heirs--The Indian Heirship Land Problem, 46 Wash.L.Rev. 709 (1971). This Act includes a provision aimed at reducing further multiplication of ownership upon the death of current interest-holders:
 
 
 3
 No undivided fractional interest in any tract of trust or restricted land within a tribe's reservation or otherwise subjected to a tribe's jurisdiction shall descedent [sic] by intestacy or devise but shall escheat to that tribe if such interest represents 2 per centum or less of the total acreage in such tract and has earned to its owner less than $100 in the preceding year before it is due to escheat.
 
 
 4
 25 U.S.C. Sec. 2206 (as originally enacted).
 
 
 5
 Mary Irving, Patrick Pumpkin Seed, and Duane, Miguel, Hope, Anthony, and Faith Cross (hereafter "Irving"), members of the Oglala Sioux Tribe, all had parents or uncles as to whom they were potential heirs or named devisees die within six months after the Indian Land Consolidation Act was passed. Upon receiving notice that a hearing had been scheduled for the week of October 24, 1983, to determine if the Oglala Tribe had a right through escheat to any lands of her decedent that might otherwise have passed to her, Irving filed this suit in district court. Her complaint requested preliminary and permanent injunctions against enforcement by the Department of Interior of section 2206 with a declaratory judgment that the provision was unconstitutional as authorizing seizure of her property without the just compensation required by the fifth amendment. The district court restrained the government from proceeding under the escheat provision for a time but then consolidated the preliminary and permanent injunction issues and denied relief, holding that Irving had only an expectancy of heirship, which could be altered by intervening legislation, and not a vested property right, which would have been entitled to constitutional protection.
 
 
 6
 It is clear that the vested property rights of individual Indians are "secured and enforced to the same extent and in the same way" as the equivalent rights of other citizens. Choate v. Trapp, 224 U.S. 665, 677, 32 S.Ct. 565, 570, 56 L.Ed. 941 (1912); see Morrow v. United States, 243 F. 854 (8th Cir.1917). It is also clear, however, that Congress may alter and condition rights that have not yet vested in individual Indians, see Northern Cheyenne Tribe v. Hollowbreast, 425 U.S. 649, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1976); United States v. Jim, 409 U.S. 80, 93 S.Ct. 261, 34 L.Ed.2d 282 (1972) (per curiam), and that the right to receive property by inheritance or devise does not attain the dignity of a property right entitled to the protection of the fifth amendment taking clause.[3] 5 G. Thompson, Commentaries on the Modern Law of Real Property Sec. 2405, at 199 (J. Grimes ed. 1979); id. Sec. 2406, at 211; id. Sec. 2411, at 240; see also Jefferson v. Fink, 247 U.S. 288, 294, 38 S.Ct. 516, 518, 62 L.Ed. 1117 (1918); Simmons v. Eagle Seelatsee, 244 F.Supp. 808, 814 n. 11 (E.D.Wash.1965), aff'd per curiam, 384 U.S. 209, 86 S.Ct. 1459, 16 L.Ed.2d 480 (1966). Cf. L. Simes & A. Smith, The Law of Future Interests Sec. 1, at 3-4 (2d ed. 1956) (possibility of taking property by inheritance or devise does not constitute "future interest" because the prospective taker is not considered to have any part of the present ownership interest). Irving on appeal thus asserts two theories by which she allegedly acquired fifth amendment rights in the questioned lands in her decedent's estate--first, that her interest vested upon the death of her ancestor while the escheat provision could operate only subsequent to that time; and second, that the language of the initial allotments of Indian land to Oglala tribe members around 1900 created vested interests in potential heirs, including her, under the common law or as a matter of contract.
 
 I.
 
 7
 Irving's first argument relies on a disingenuous and excessively technical construction of certain words in section 2206. "Escheat," Irving reasons, denotes the operation by which the government acquires the right to an estate left vacant because the possessor has died intestate without heirs. Therefore, when heirs exist, their rights vest instantly at death, before the state can take any interest, and the use of the term "escheat" in section 2206 is a "subterfuge" for the taking without compensation of Irving's already vested property rights.
 
 
 8
 The statute, however, on its face contemplates the existence of heirs or even devisees, and Congress earlier had already provided that certain Indian lands were to escheat to the tribe, as opposed to the state or federal government, when the possessor died without heirs. 25 U.S.C. Sec. 373a (1982). "Escheat," then, seemingly was not intended to have in section 2206 the limited meaning ascribed to it by Irving. A statute should be construed to make sense, see Griffin v. Oceanic Contractors, 458 U.S. 564, 575, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982), and so as to support, rather than defeat, its constitutionality. Crowell v. Benson, 285 U.S. 22, 46, 52 S.Ct. 285, 290, 76 L.Ed. 598 (1932). The sensible reading of section 2206 is that Congress, exercising its power as sovereign[4] to control disposition of property at death, declared a limited class of property rights incapable of so passing. See Irving Trust Co. v. Day, 314 U.S. 556, 562, 62 S.Ct. 398, 401, 86 L.Ed. 452 (1942); Mager v. Grima, 49 U.S. (8 How.) 490, 12 L.Ed. 1168 (1850); 5 G. Thompson, supra, Sec. 2406, at 212; 5A G. Thompson, Commentaries on the Modern Law of Real Property Sec. 2607, at 354 (J. Grimes ed. 1978). Thus, no interest within the purview of the statute could ever have vested in Irving.
 
 
 9
 This interpretation is supported by a comparison of the language of section 2206 with that of the immediately preceding section of the Indian Land Consolidation Act, 25 U.S.C. Sec. 2205, as originally enacted. Section 2206 commands that no Indian lands within its purview "shall descedent [sic] by intestacy or devise"; section 2205 in contrast provides that, upon appropriate action by a given tribe, nonmembers of that tribe and non-Indians "shall not be entitled to receive by devise or descent" (emphasis added) any interest in allotted individual trust land. Congress in the legislative history expressly stated that section 2205 was not intended as a restriction on the testamentary power of Indians and that interests were to pass according to will if the tribe did not exercise its right to acquire the land by paying fair market value. H.R.Rep. 908, 97th Cong., 2d Sess. 9, reprinted in 1982 U.S.Code Cong. & Ad.News 4415, 4418; see also 25 U.S.C. Sec. 2205(a)(3). Given the differing language and the failure in section 2206 to provide for compensation, it is fair to infer that Congress in that section, in contrast to its intent in section 2205, did presume to limit the power of disposition at death as to certain lands.[5]
 
 
 10
 Such an interpretation further is not inconsistent with the presence of the term "escheat," which, to use the definition cited by Irving, is "[a] reversion of property to the state in consequence of a want of any individual competent to inherit." Black's Law Dictionary 488 (5th ed. 1979) (emphasis added). Irving limits the meaning of "any individual competent to inherit" to "heirs"; but since "heirs" themselves are identified and ordered by the sovereign, 5 G. Thompson, supra, Sec. 2405, at 202, 240,[6] there seems no reason why the sovereign could not use the terminology "escheat" in purporting to make parties incompetent to inherit for reasons other than lack of a sufficient degree of relationship. "Escheat" historically was used to refer to the operation by which a sovereign acquired title to land due to, for example, the possessor's misconduct, as well as upon death without heirs. Id. Sec. 2510, at 464-65. The term now may encompass the passing to the sovereign of land that has been abandoned or as to which the owner is missing or which is illegally held by a corporation. Id. Sec. 2511, at 474.[7] Thus, the use of "escheat" is actually most consistent not with Irving's interpretation that section 2206 takes land already vested in Indian heirs and devisees but with the interpretation that the government has deemed that no person shall be "competent" to inherit certain de minimis interests in land. Affected de minimis interests thus could never vest in purported heirs and devisees and did not vest in Irving here so that she has no property right protectible under the fifth amendment taking clause.
 
 II.
 
 11
 In the alternative, Irving argues that she gained some sort of vested future interest in the land of her decedent through the language of the trust patents pursuant to which the United States originally allotted lands to individual Indians. The Oglala Sioux patents were to declare
 
 
 12
 that the United States does and will hold the lands thus allotted * * * in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State or Territory where such land is located * * * Provided further, That the law of descent and partition in force in the State or Territory where the lands may be situated shall apply thereto * * *.
 
 
 13
 Act of Mar. 2, 1889, ch. 405, Sec. 11, 25 Stat. 888, 891.
 
 
 14
 Initially we point out that, contrary to the manner in which the Irving cited this passage in her brief, the "heirs" language appears only in the context of identifying beneficiaries of the trusts and not in conjunction with grants of interests to individual Indians; the term may function merely to indicate that the trust status of the lands was to continue upon the death of holders of equitable interests.[8] Further, since we have no evidence that Irving's decedent was an original allottee, she cannot claim a vested right by construing the patents as creating life estates in the allottees: the remainders would then vest fees in the first generation of heirs and would not pass rights to the allottees' future decedents. Creation of a fee tail generally requires an express reference, absent here, to heirs "of his body" or other words of procreation, 4 G. Thompson, Commentaries on the Modern Law of Real Property Sec. 1866, at 483 (J. Grimes ed. 1979), and such an estate also would not create a vested interest in Irving because heirs apparent in tail again have only expectancies. L. Simes & A. Smith, supra, Sec. 398. Irving, rather, seems to be relying either on an ancient common law theory that land was actually owned by families rather than individuals such that heirs had property rights which could not be defeated by alienation without their consent, see 5 G. Thompson, supra, Sec. 2406, at 206-08; id. Sec. 2410, at 234, or, as clarified in her reply brief, on the maxim that enactments should be construed in favor of and as they would have been understood by the Indians, Choate v. Trapp, 224 U.S. 665, 675-77, 32 S.Ct. 565, 569-70, 56 L.Ed. 941 (1912); Antoine v. United States, 637 F.2d 1177, 1179-80 (8th Cir.1981), particularly when, as here, the statute is in the nature of a treaty or contract and would not have taken effect absent approval by the tribe. See Act of Mar. 2, 1889, ch. 405, Sec. 28, 25 Stat. 888, 899.
 
 
 15
 All these theories are subject to several objections. First, the existence of any vested right in an allottee's heirs would mean that an Indian to whom the land was allotted would have no power to dispose of that property by will. Subsequent enactments of Congress, however, assume such a power of devise and presume to oversee and condition it. E.g., 25 U.S.C. Secs. 373, 464 (1982). Irving does not even seem to recognize the implications of her argument as to these statutes; in fact, certain of her fellow plaintiffs are actually claiming under a will rather than as intestate heirs. Cf. L. Simes & A. Smith, supra, Sec. 403, at 433 (courts' concern with finding vested rights in potential heirs and devisees springs in part from the intolerable interference with owner control over property that thus would be allowed).
 
 
 16
 Second, the language of the allotment act pursuant to which the Oglala Sioux took their individual trust patents expressly provides that state law as to intestate succession shall control. Such a reference would be unnecessary if the allotment by its terms had already created vested rights in certain heirs.[9] Finally, we point out that Congress, when it has so intended, has made clear in its statutes that lands allotted in trust to individual Indians were to pass to those individuals' heirs. E.g., Act of June 30, 1902, ch. 1323, Sec. 16, 32 Stat. 500, 503 ("The homestead of each citizen shall remain, after the death of the allottee, for the use and support of children born to him after May 25, 1901, but if he have no such issue then he may dispose of his homestead by will * * *."); Act of Feb. 6, 1871, ch. 38, Sec. 8, 16 Stat. 404, 407 ("[T]he lands assigned and allotted as aforesaid shall be held inalienable, and in case of the death of any person, his or her right thereto shall descend to his or her heirs * * *."); cf. Treaty with the Omahas, Mar. 16, 1854, art. 6, 10 Stat. 1043, 1044 (The President "may prescribe such rules and regulations as will insure to the family, in case of the death of the head thereof, the possession and enjoyment of such permanent home"); Treaty with the Ottoes & Missourias, Mar. 15, 1854, art. 6, 10 Stat. 1038, 1039 (identical language except "secure" used in place of "insure").
 
 
 17
 These considerations are equally relevant to the argument that the allotments should be read as the Indians would have understood them. Highly malleable rules of statutory construction must have some limit, and the Supreme Court has also stated that "[l]egislation dealing with Indian affairs 'cannot be interpreted in isolation but must be read in light of the common notions of the day and the assumptions of those who drafted them.' " Wilson v. Omaha Indian Tribe, 442 U.S. 653, 666, 99 S.Ct. 2529, 2537, 61 L.Ed.2d 153 (1979) (quoting Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 206, 98 S.Ct. 1011, 1019, 55 L.Ed.2d 209 (1978)). A conclusion that a trust patent vested rights in an Indian's heirs would be contrary to the recognized purpose of the allotment scheme of converting Indians to the American system of individualized, as opposed to tribal, land ownership, see Mattz v. Arnett, 412 U.S. 481, 496, 93 S.Ct. 2245, 2253, 37 L.Ed.2d 92 (1973); Felix S. Cohen's Handbook of Federal Indian Law 128-32 (1982 ed.), a system which of course is characterized not by common law concepts of family title but generally by the right of devise. The legislative history cited by plaintiffs, S.Exec.Doc. No. 51, 51st Cong., 1st Sess. (1890), found in Serial Set 2682, is not to the contrary. Any emphasis that lands allotted to individual Indians could not be taken from them and their children does not necessarily lead to the conclusion that the parties intended to vest rights in those allottees' heirs; the record is equally consistent with the idea that the lands were to be protected from future interference or diminution by the government but that the individual Indians themselves, subject to safeguards against trickery by white settlers, could control whether their lands passed to their heirs.[10]
 
 III.
 
 18
 This is not to say that the legislative history cited by Irving and the treaty/contract nature of the Sioux allotment act are of no consequence to any consideration of section 2206. As we implied (and footnote 10, supra, illustrates), the Indians clearly had a concern with retaining possession of their land in the face of possible future governmental interference, of which the escheat statute here might be an example. Thus, while potential heirs and devisees took no vested rights, protectible interests within the contemplation of the fifth amendment might still exist in the original allottees themselves and in successors, such as Irving's decedent, to whom land had actually passed prior to the enactment of section 2206. We must first decide, however, if Irving should be granted standing to raise such third-party rights.[11]
 
 A.
 
 19
 While "[o]rdinarily, one may not claim standing * * * to vindicate the constitutional rights of some third party," Barrows v. Jackson, 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953), that requirement is not jurisdictional[12] but is "only a rule of practice" which may be "outweighed by the need to protect the fundamental rights which would be denied." Id. at 257, 73 S.Ct. at 1035. The Supreme Court has suggested two factors to be considered in determining when the third-party rule should be suspended: the relationship of the litigant to the person whose right he seeks to assert, and the ability of the third party to assert his own right. Singleton v. Wulff, 428 U.S. 106, 114-16, 96 S.Ct. 2868, 2874-75, 49 L.Ed.2d 826 (1976); see Gold Cross Ambulance & Transfer v. City of Kansas City, 705 F.2d 1005, 1016 (8th Cir.1983), petition for cert. filed, 52 U.S.L.W. 3039 (U.S. July 25, 1983) (No. 83-138).[13]
 
 
 20
 The second part of this test is obviously met here. Irving's decedent cannot rise from the grave to assert his own rights. The right to pass property by devise or inheritance, however, cannot truly be exercised until death; seemingly the right must contemplate not just, for example, the writing of the will but also the disposition of the property according to the wishes expressed therein. If heirs and devisees do not have standing to assert their decedents' rights during settlement of estates, rights of devise and inheritance become mirages shimmering in life but vanishing at death upon attempted use.
 
 
 21
 The nature of the right to dispose of property at death also has implications for the first factor of the third-party standing test, i.e., the relationship between the litigant and the person whose rights he seeks to assert. Since the act of passing property has no meaning absent receipt by the selected beneficiary, section 2206 clearly "preclude[s] or otherwise adversely affect[s] a relationship existing between [Irving] and the persons whose rights assertedly are violated." Warth v. Seldin, 422 U.S. 490, 510, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). "[E]njoyment of the right [of passing property at death] is inextricably bound up with the activity [inheriting property] the litigant wishes to pursue." Singleton, 428 U.S. at 114, 96 S.Ct. at 2874. We cannot see where the issues would have been more concretely presented or vigorously contested in a suit brought by Irving's decedent prior to his death. Id. at 115, 96 S.Ct. at 2874; see also Secretary of State v. Joseph H. Munson Co., --- U.S. ----, 104 S.Ct. 2839, 2848, 81 L.Ed.2d 786 (1984). There is no conflict of interest between Irving and her decedent. See Gold Cross Ambulance, 705 F.2d at 1016; see also Munson Co., 104 S.Ct. at 2848.
 
 B.
 
 22
 Section 2206 in requiring that certain de minimis shares of land escheat to the individual Indians' tribes upon death in essence reduces the ownership interests of those allottees from fees to life estates, a diminution which the Supreme Court has suggested in dicta would constitute a taking without compensation in violation of the fifth amendment. Choate v. Trapp, 224 U.S. 665, 674, 32 S.Ct. 565, 569, 56 L.Ed. 941 (1912). We need not, however, reach that far (or consider the issue of other possible constitutional limits on the power of the sovereign to abrogate inheritance, see supra note 3) to find that the decedents in this case had vested rights in being able to control the disposition of their property at death. Our analysis instead begins with an evaluation of the rights created in the allotment statute and patents.
 
 
 23
 The Supreme Court in Choate considered whether Congress could through subsequent legislation remove the tax exemption from lands allotted to individual Choctaw and Chickasaw Indians pursuant to the Atoka Agreement, which was bodily incorporated in the Curtis Act of June 28, 1898, ch. 517, Sec. 29, 30 Stat. 495, 505, 507. The Court stated that while a statute could be repealed at the will of Congress, rights acquired thereunder could not be destroyed and held that each allottee had gained a vested right protected by the Constitution because his patent was issued only on the condition that he relinquish all claims to former commonly held Indian tribal property. 224 U.S. at 671-72, 32 S.Ct. at 567-68. Each Indian had "furnished a consideration which was sufficient to entitle [him] to enforce whatever rights were conferred," id. at 672, 32 S.Ct. at 568; since the Indians were bound by their concessions and could no longer be heard to assert claims to former common tribal lands, the United States similarly was to be bound by the rights it conveyed in the statute and allotment patents. Id. at 674, 32 S.Ct. at 569. The tax exemption was a property right incident to the land which had vested in the individual Indian allottees pursuant to the statute and patents. Id. at 673-77, 32 S.Ct. at 568-70.
 
 
 24
 While the tax exemption in Choate was expressly limited to the original allottees, our subsequent decisions show that if more expansive vested rights are created, they may devolve to and be enforced by Indian successors to patent lands. See County of Thurston v. Andrus, 586 F.2d 1212 (8th Cir.1978), cert. denied, 441 U.S. 952, 99 S.Ct. 2181, 60 L.Ed.2d 1057 (1979). Nor do we have trouble finding in other regards that the logic of Choate applies to the allotment statute at issue here. In Thurston we construed the prototype allotment act (see supra note 2) as being, as in Choate, in the nature of a bargain, 586 F.2d at 1220; and the Sioux allotment act at issue here in fact has a specific clause to the effect that acceptance of benefits thereunder by individual Indians would be taken as a release of those individuals' claims to tribal lands. Act of Mar. 2, 1889, ch. 405, Sec. 16, 25 Stat. 888, 893. Each Indian allottee thus gained vested rights through the Sioux land act; and the statutory language, with its provision that state law should govern inheritance, and the legislative history cited by Irving, with its emphasis on obtaining patents to protect allotments from future governmental interference (see supra note 10), make clear that the ability to pass the lands upon death was among the rights contemplated by the parties as vesting in the allottees. Furthermore, disposition of property at death has always been an integral and distinguishing factor as to types of property interests, and the power to control such disposition predominantly characterizes the "white man's ways" which the Indians were to assimilate. The individual Sioux thus had "enforceable expectations" that that power was part of the rights the received in return for relinquishment of their claims to former tribal lands. See Thurston, 586 F.2d at 1221.
 
 
 25
 By its plain terms--and there is no contention to the contrary--section 2206 does not provide for compensation to the estates of decedents for the land it declares to escheat. Accordingly, the statute is in violation of the fifth amendment, and we need not reach the further question of whether the taking was for a public purpose. We reverse the district court, declare section 2206--as written when asserted against Irving and as amended (see supra note 1) insofar as the new provision preserves the language of the old--unconstitutional, and remand for entry of appropriate relief.
 
 
 
 [1]
 This statute has been amended since oral arguments were heard in this case, Act of Oct. 30, 1984, Pub.L. No. 98-608 (H.R.J.Res. 158), 98 Stat. 3171, 3173, but its operation as challenged here is unaffected and the parties have not suggested that any of the changes put the plaintiffs outside the provision's coverage
 
 
 [2]
 This Act applied to the former Great Sioux Reservation the land distribution system authorized by the Indian General Allotment Act, ch. 119, 24 Stat. 388 (1887) (codified as amended at 25 U.S.C. Secs. 331-334, 339, 341-342, 348-349, 381 (1982))
 
 
 [3]
 Apparently, no case has ever addressed an attempt by a sovereign to completely abolish inheritance and require that certain property escheat at death. Because of the sovereign's power over the order of succession, however, any possibility that total abrogation of inheritance might be impermissible does not alter the conclusion that no particular individual potential heir has a vested right, which is the issue with which we are concerned. Claims thus for protection against taking of property under the fifth amendment are to be distinguished from substantive due process or equal protection allegations which potential heirs might choose to raise. Also, abrogation of inheritance might more properly be seen as implicating a right of the deceased to pass his property. Cf. infra section III
 
 
 [4]
 The power of Congress over Indians has been characterized as similar to the power Congress exercises over the District of Columbia, territories and possessions, and other federal enclaves. Felix S. Cohen's Handbook of Federal Indian Law 219-20 (1982 ed.). Congress's Indian powers thus are comparable to those of state governments in their respective realms
 
 
 [5]
 For other sections that, like section 2205, give effect to the decedent's intent but then under certain circumstances replace an heir's or devisee's interest in land with monetary compensation, see 25 U.S.C. Secs. 272, 273 (1982)
 
 
 [6]
 One commentator has indeed observed a "noticeable trend in the statutes to increase the possibility of the state being an heir by limiting the circle of partiable inheritance." 5 G. Thompson, supra, Sec. 2411, at 240
 
 
 [7]
 The language in additional passages in 5 Thompson further suggests that "escheat" may loosely, if not technically, be used to refer to any circumstance in which the sovereign takes title to property. See 5 G. Thompson, supra, Sec. 2510, at 463; id. Sec. 2514, at 482
 
 
 [8]
 For example, regulations provide that a non-Indian to whom allotted lands pass is entitled to a patent in fee rather than in trust. 25 C.F.R. Sec. 152.6 (1983)
 
 
 [9]
 We further reject any argument that this clause functioned to vest rights in those individuals who would have been heirs under the law of the applicable state at the time of allotment, thus protecting their expectancies from changes in state as well as federal law. See Jefferson v. Fink, 247 U.S. 288, 38 S.Ct. 516, 62 L.Ed. 1117 (1918)
 
 
 [10]
 Senate Executive Document No. 51 is the report of the Commission sent to the Sioux territories to obtain the approval of the various tribes, as necessary before the allotment statute at issue here could take effect. See Act of Mar. 2, 1889, ch. 405, Sec. 28, 25 Stat. 888, 899. Irving quotes from the appendix, exhibit c, which is the diary kept by the Commission during its travels. The following passages are representative of the material in her brief:
 The great trouble with the other treaties was that they did not give the Indians patents for their land, and now this treaty gives you papers for your land, that nobody can take away from you. [Applause.] Your taking a patent for it takes it out of Congress, and they can't make any change in it.
 S.Exec.Doc. No. 51, supra, at 54 (Gen. Crook at the Rosebud Agency, Dakota, June 7, 1889).
 And if you take your land in severalty a deed is given to you by the Great Father, and he holds it in trust for you for twenty-five years, so that you cannot be traded or cheated out of it, so that it will remain for you and your children and your children's children.
 Id. at 73 (Gen. Warner at the Pine Ridge Agency, Dakota, June 15, 1889).
 When you get a deed for your land nobody can take it away from you or your children afterwards. As long as you keep it in common as you do now you are liable to be legislated out of it just as you have been in the past.
 Id. at 85 (Gen. Crook at the Pine Ridge Agency, Dakota, June 17, 1889).
 The references to heirs and children in conjunction with land actually seem to be relatively sparse given the nearly 200 pages of diary. The dialogue between the Indians and the Commission centered more on whether the government would live up to obligations assumed in this and previous treaties (i.e., Treaty with the Sioux, Apr. 29, 1868, 15 Stat. 635), particularly in regard to providing education to Indian children and supplying agricultural implements and seeds and clothing and food rations. The general emphasis was that conversion to "white man's ways" and system of individual land ownership with the anticipated achievement of Indian self-sufficiency would promote the best life and the best future for the Indians' children, not that the treaty would vest specific rights to Indian lands in heirs in perpetuity: "All I can say now is, when I am laying on my death-bed, if you do not defeat this bill, I will have the satisfaction of knowing that I can leave a piece of land to my children * * *." S.Exec.Doc. No. 51, supra, at 113 (American Horse at the Pine Ridge Agency, Dakota, June 21, 1889) (emphasis added).
 
 
 [11]
 There may be some question as to whether the third-party rights of decedents were raised sufficiently on their merits to justify our attention here. Irving's brief, however, in at least two places appears to be arguing her decedent's rights (p. xii--"The Appellants also urge that the Court clearly limit the power of Appellees, as the sovereign, to extinguish the title to the decedent's property * * * the Appellees' argument that [the sovereign's power] includes the right to extinguish interests of the decedent * * * points * * * too broadly" (emphasis added); p. 19--"The Court did not hold * * * that the State of New York had or was entitled to extinguish the decedent's interest in his property * * *." (emphasis added)). In addition, the third-party argument follows from Irving's assertions that the allotment statute was in the nature of a treaty or contract except that this theory looks to rights vested in a different party (the distinction between decedents' and heirs' rights in this context might even seem overly technical to some). We thus feel comfortable in deciding the case on this basis
 
 
 [12]
 Standing to raise third-party rights, or jus tertii, thus is to be distinguished from "injury in fact" standing, which is mandated by the case or controversy requirement of article III of the Constitution and which is jurisdictional. Singleton v. Wulff, 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976). Irving clearly has standing in the latter sense; the injury of loss of property (though not of a vested right to property) is sufficiently concrete since the ancestor through whom Irving claims has died intestate and we know Irving would have taken absent the operation of section 2206
 
 
 [13]
 The Supreme Court in Secretary of State v. Joseph H. Munson Co., --- U.S. ----, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786 (1984) states that once injury-in-fact standing (see supra note 12) has been established, the only concern is whether the third party "can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal." Because the Court's analysis in that case, however, draws on the presence of first amendment issues and interweaves overbreadth doctrine, we are not certain how the holding applies to our facts and we will apply Singleton v. Wulff, supra, here anyway, it being the more restrictive